**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Matthew Edward LOTHIAN,
Defendant–Appellant.**

No. 90–50629.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 6, 1992.

Decided Oct. 5, 1992.

Chad S. Hummel, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellant.

Mark D. Larsen, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before: BOOCHEVER, NORRIS, and NOONAN, Circuit Judges.

BOOCHEVER, Circuit Judge:

Matthew Lothian appeals his conviction on twenty counts of mail fraud, wire fraud, and interstate transportation of property obtained by fraud in violation of 18 U.S.C. §§ 1341, 1343, and 2314. The charges arose out of Lothian's participation in a fraudulent boilerroom telemarketing scheme selling investments in precious metals. On appeal Lothian asks that we overturn his conviction on eleven counts that charge him with conduct occurring during his absence from the scheme, arguing that he had withdrawn from the scheme during this period. He further argues as to all twenty counts that the evidence of fraudulent intent was insufficient to support his conviction and that the district court erred in admitting evidence concerning other fraudulent schemes that involved his co-defendants but not Lothian.[1] We reverse Lothian's conviction on four counts charging him with conduct that occurred during his absence from the scheme, but affirm his conviction on the remaining counts.

## BACKGROUND

Because Lothian contends that there was insufficient evidence to sustain his conviction, we summarize the relevant facts from the evidence introduced at trial in the light most favorable to the government. *See United States v. Adler*, 879 F.2d 491, 495 (9th Cir.1988). In May 1985 Matthew Lothian and Barry Goldberg began soliciting investors in precious metals by telephone from Goldberg's residence in Laguna Hills, California. Their enterprise was known as B.N. Goldberg & Associates ("BNGA"). Goldberg, the owner of BNGA, was the architect of the scheme and had recruited Lothian, with whom he had worked at a commodities brokerage, to join him. Lothian and Goldberg conferred daily on every aspect of the enterprise. Their sales pitch to potential customers was rife with misrepresentations. Lothian and Goldberg lied about BNGA, which they characterized as an established and reputable brokerage with a strong track record and a separate research department staffed with market experts. A brochure that they mailed to potential customers contained out-and-out falsehoods concerning BNGA's past performance and asserted that BNGA had predicted and helped clients cash in on the silver run of the early 1980s, a period in which BNGA had not even existed. Lothian and Goldberg also lied about themselves, using fictitious names on the telephone and misrepresenting their qualifications and experience as commodities brokers.

Finally, Lothian and Goldberg lied about what they would do with the money customers sent in. Customers were told that sending BNGA twenty percent of the current market price of the precious metal would secure their rights to the metal at that price; in other words, a twenty percent "down payment" would secure their position in the commodities market. Goldberg and Lothian told customers that if the price of the metal went up, the customer would be able to profit by selling the position. Customers were also told that they had the alternative of taking possession of the metal by paying the remaining eighty percent of the current market price. Commodities brokers who sell precious metal investments on margin, as BNGA was doing, typically secure investors' market positions by "hedging," buying a contract or option for the metal the investor has ordered in the futures market. During the time Lothian and Goldberg were operating out of Goldberg's residence, however, they did not use the money to hedge. Instead, it was diverted as income for Lothian and Goldberg and to pay BNGA's start-up expenses.

1. During the pendency of this appeal Lothian filed a petition for a writ of error *coram nobis*. In the petition Lothian argued that he was entitled to a new trial because one of the government's witnesses had lied on the stand about the witness' use of aliases. The district court denied the petition, and Lothian appealed. Lothian's direct appeal and his collateral *coram nobis* appeal were consolidated for hearing before this panel. In a separate unpublished disposition we affirm the district court's denial of the writ.

In October 1985 BNGA moved to offices in Laguna Beach, California, and expanded its operation by hiring a large sales staff. Goldberg managed the overall operations of BNGA, most importantly customer funds. Lothian served as the sales manager, training the sales staff in the pitch that he and Goldberg had perfected. He continued to consult with Goldberg on a daily basis concerning all aspects of BNGA's business. From October to December 1985 BNGA did hedge, albeit inadequately. In December 1985 BNGA was unable to meet a margin call, forcing the liquidation of a substantial portion of its customers' positions. Shortly thereafter Lothian resigned from BNGA, telling Goldberg that he was going to Europe to begin a new business venture.

After Lothian's resignation, Goldberg hired a new sales manager, Lester Thompson. Thompson came to BNGA from another precious metals brokerage, First American Currency. First American recently had been closed by postal inspectors, and Thompson brought with him to BNGA First American's accountant and many of its salespeople. He also imported to BNGA First American's sales program, which, unlike BNGA's former program, subjected customers' accounts to margin calls when the price of metal fell and forced liquidations when customers could not meet the margin call. Under Thompson's guidance, BNGA decreased the amount it was hedging in the metals market and hedged only intermittently. On Thompson's recommendation, BNGA began to sell investments in foreign currency but did not hedge these positions. Thus BNGA increasingly gambled that the market would go down and that customers would not meet the resulting margin calls, thereby relieving BNGA of liability to its customers. Thompson developed a new customer brochure, including new misrepresentations, based on materials used by First American Currency. In the spring of 1986, Thompson, Goldberg, and BNGA's accountant purchased Schoolhouse Coins, another fraudulent enterprise, using $75,000 of BNGA funds.

Lothian failed in his European business venture and returned to California sometime in the spring of 1986. Goldberg testified that during Lothian's absence Lothian had had "nothing whatsoever" to do with BNGA. Lothian was broke upon his return and Goldberg loaned him money, which Lothian later repaid. Lothian returned to work at BNGA as a salesman and later served as a manager, assisting Thompson.

When Goldberg became concerned about the mounting liability of the company to clients whose market positions had not been secured with the funds that they had sent in, Thompson suggested that Goldberg sell BNGA. In August 1986 Goldberg sold BNGA to one of the salespeople, Mark Ott, who then operated it under the name of M.S. Sawyer & Co. ("Sawyer"). Sawyer continued BNGA's fraudulent business practices, and Lothian continued to work as a sales manager. When customers ordered their accounts liquidated in September 1986, Sawyer was unable to pay them and the business closed.

A federal grand jury indicted Lothian, Goldberg, Thompson, Ott, and three sales agents on charges of mail fraud, wire fraud, interstate transportation of property obtained by fraud, and failure to file income tax returns. No conspiracy count appeared in the indictment. Goldberg and another defendant entered pleas of guilty. The other defendants were tried together before a jury in July 1990. The jury returned guilty verdicts on all charges against Lothian, Thompson, and Ott. Lothian was sentenced to a year and a day in prison with five years probation and was ordered to pay restitution to the victims of the fraudulent scheme. Lothian timely appeals his conviction.

## DISCUSSION

Lothian's defense at trial was based on lack of fraudulent intent and withdrawal. Lothian argued to the jury that before he resigned in December 1985 BNGA was a legitimate operation properly securing its clients' positions in the market, that he could not be held liable for conduct occurring during his absence, and that when he

returned to BNGA in the spring of 1986 he was unaware of the fraudulent practices that Thompson had introduced. He bases his appeal on similar grounds. First, he argues that his resignation from BNGA constituted withdrawal and that the government failed to establish his criminal liability for acts committed during his absence. Second, he contends that the evidence of his fraudulent intent was insufficient to support his conviction on any of the counts. Finally, he argues that the admission of evidence concerning other fraudulent schemes with which he was not associated was unfairly prejudicial.

## I. *Withdrawal*

■ Lothian attacks his conviction on eleven of the twenty counts on a theory of withdrawal: five. counts of mail fraud (counts 1–5), three counts of wire fraud (counts 13, 15, 16), and three counts of interstate transportation of property obtained by fraud (counts 23, 24, 27). These counts involve uses of the mails and wires and interstate transport between late December 1985, when Lothian resigned his position at BNGA, and early May 1986, when Lothian contends he returned to BNGA. Lothian argues that he is entitled to acquittal on these counts because the government failed to rebut his prima facie showing of withdrawal. Alternatively, he argues that he is entitled to a new trial based on the court's failure properly to instruct the jury on the withdrawal defense. In reviewing the district court's denial of Lothian's motion for acquittal, we view the evidence in the light most favorable to the prosecution to determine whether "the jury reasonably could have found the defendant guilty beyond a reasonable doubt." *United States v. Sarault*, 840 F.2d 1479, 1487 (9th Cir.1988). We review the court's formulation of jury instructions for abuse of discretion. *United States v. Johnson*, 956 F.2d 197, 199 (9th Cir.1992).

■ Withdrawal is traditionally a defense to crimes of complicity: conspiracy and aiding and abetting. *See Hyde v. United States*, 225 U.S. 347, 369–70, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912) (con-

spiracy); Model Penal Code § 2.06(6)(c) (accomplice liability). Because Lothian was neither charged with nor convicted of conspiracy or aiding and abetting, we are called upon in this case to consider the application of the withdrawal defense to substantive fraud offenses outside the context of conspiracy law.

### A. Withdrawal and Conspiracy Law

■ Because withdrawal from a conspiracy is closely akin to withdrawal from a mail or wire fraud scheme, we begin with the withdrawal defense as it applies to a charge of conspiracy. To withdraw from a conspiracy a defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take " 'definite, decisive, and positive' steps to show that the [defendant's] disassociation from the conspiracy is sufficient." *United States v. Loya*, 807 F.2d 1483, 1493 (9th Cir.1987) (quoting *United States v. Smith*, 623 F.2d 627, 631 (9th Cir.1980)). The crime of conspiracy consists of two elements: the defendant's agreement to accomplish an illegal objective and an overt act on the part of some member of the conspiracy toward achieving that objective. *Id.* Withdrawal negates the element of agreement to the conspiracy's unlawful objective because it "marks [the] conspirator's disavowal or abandonment of the conspiratorial agreement." *United States v. Read*, 658 F.2d 1225, 1232 (7th Cir.1981).

■ This proposition has several logical consequences. First, because due process requires that the government prove each element of the offense beyond a reasonable doubt, once the defendant introduces sufficient evidence to make a prima facie case of withdrawal, the burden shifts to the government to prove beyond a reasonable doubt that the defendant did not withdraw. *United States v. Steele*, 685 F.2d 793, 804 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Read*, 658 F.2d at 1236; *cf. Sarault*, 840 F.2d at 1487 (government not required to rebut evidence of withdrawal because overt act had already occurred and

withdrawal did not furnish a defense to conspiracy). *But see United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir.) ("Defendants have the burden of proving withdrawal because it is an affirmative defense."), *cert. denied*, —— U.S. ——, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991), *and cert. denied*, —— U.S. ——, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992). Second, once an overt act has taken place to accomplish the unlawful objective of the agreement, the crime of conspiracy is complete and the defendant is liable despite his later withdrawal. *Loya*, 807 F.2d at 1493.

In addition to being a crime in itself, conspiracy also determines the scope of a defendant's criminal liability for substantive offenses committed in furtherance of a conspiracy. A defendant is criminally liable for any underlying substantive offenses committed by co-conspirators during the defendant's membership in the conspiracy. On the other hand, a defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy. *Levine v. United States*, 383 U.S. 265, 266, 86 S.Ct. 925, 925, 15 L.Ed.2d 737 (1966). In this context, therefore, the withdrawal defense also limits liability for underlying substantive offenses.

Lothian, however, was not charged with conspiracy. He was charged with and convicted of only substantive fraud offenses:

mail fraud,[2] wire fraud,[3] and interstate transportation of fraudulently obtained property.[4] We now turn to withdrawal in these contexts.

### B. Mail and Wire Fraud

Mail and wire fraud share as a common first element the existence of a scheme to defraud, which, when more than one person is involved, is analogous to a conspiracy. *See Read*, 658 F.2d at 1239. The second element is using or causing the use of the mails or wires in furtherance of the scheme. *See* 18 U.S.C. §§ 1341, 1343 (1982). The defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954).

Because an essential element of these offenses is a fraudulent scheme, mail and wire fraud are treated like conspiracy in several respects. Similar evidentiary rules apply. Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants. *Read*, 658 F.2d at 1239; *Rob-*

2. The federal mail fraud statute provides, in pertinent part:

> Whoever, having devised or intending to devise any *scheme or artifice to defraud*, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or *knowingly causes to be delivered by mail* ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (1982) (emphasis added).

3. The federal wire fraud statute provides:

> Whoever, having devised or intending to devise *any scheme or artifice to defraud*, or for obtaining money or property by means of

false or fraudulent pretenses, representations, or promises, *transmits or causes to be transmitted by means of wire*, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purposes of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1343 (1982) (emphasis added).

4. The federal property fraud statute provides, in pertinent part:

> Whoever *transports in interstate or foreign commerce* any goods, wares, merchandise, securities or *money, of the value of $5,000 or more, knowing the same to have been* stolen, converted or *taken by fraud*
>
> ....
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 2314 (1982) (emphasis added).

inson v. United States, 33 F.2d 238, 240 (9th Cir.1929) ("[I]f a conspiracy exists in fact [as when a scheme to defraud is shared by several], the rules of evidence are the same as where a conspiracy is charged."). We also apply similar principles of vicarious liability. Like co-conspirators, "knowing participants in the scheme are legally liable" for their co-schemers' use of the mails or wires. *See United States v. Dadanian*, 818 F.2d 1443, 1446 (9th Cir.1987), *modified*, 856 F.2d 1391 (1988).

The question is how similarly conspiracy's withdrawal defense applies to mail and wire fraud. Circuit precedent indicates our willingness to import withdrawal principles from the conspiracy context when a fraudulent scheme is charged. *See Reisman v. United States*, 409 F.2d 789, 792–93 (9th Cir.1969). Recently, however, the Seventh Circuit has held that "withdrawal is not an available defense to ... substantive [fraud] counts." *Read*, 658 F.2d at 1240. The *Read* court distinguished between conspiracy liability, which punishes membership in an agreement, and mail fraud liability, which punishes the *act* of using the mails, and noted that membership in a fraudulent scheme is not an element of mail fraud. *Id.* The defendant in *Read* had directed a key part of the scheme, and the court found that the charged mailings contained falsehoods that were an "inevitable consequence" of his actions. *Id.* Withdrawal from the scheme had no effect on these consequences and therefore did not provide a defense to the substantive counts.

Although we find the Seventh Circuit's rationale in *Read* instructive in determining the proper contours of the withdrawal defense when a fraudulent scheme is charged, we do not find it entirely applicable to Lothian's offenses. In our view the liability for substantive fraud offenses *is* based on participation in a fraudulent scheme, for in this circuit a defendant who is a "knowing participant" in such a scheme is vicariously liable for co-schemers' uses of the mails or wires. *Dadanian*, 818 F.2d at 1446. Withdrawal ends the defendant's knowing participation, and therefore can negate the element of use of the mails or wires. At the same time, however, withdrawal will not shield a defendant from liability for uses of the mails of wires that are an inevitable consequence of actions taken while a participant in the scheme. Thus in *Read*, for example, the defendant was liable despite his resignation because he had "directed the inventory inflation scheme which largely contributed to the false statements contained in the mailings.... The mailings ... were an inevitable consequence of his actions." *Read*, 658 F.2d at 1240.

The government, of course, always bears the burden of proving beyond a reasonable doubt the use of the mails and wires. The government must introduce evidence to show that the defendant "caused" each use of the mails or wires. Showing the defendant's knowing participation in the scheme at the time of the prohibited communications is sufficient. *Cf. Van Riper v. United States*, 13 F.2d 961, 964 (2d Cir.) ("[T]he conspiracy count adds nothing of substance to the [mail fraud] charge, except as it relieves the prosecution of the necessity of showing the connection of all the defendants ... at the date of the posting of the letters laid in the indictment."), *cert. denied*, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926). When the defendant has introduced prima facie evidence of withdrawal from participation in the scheme, however, the government, to overcome a motion for acquittal, must rebut the showing of withdrawal. To do so, the government's evidence must be sufficient to support a finding that the defendant did not withdraw or that each charged use of the mails or wires was the foreseeable result of actions taken by the defendant or his co-schemers before the defendant's withdrawal.

We now apply these principles to the evidence introduced at Lothian's trial. Lothian resigned from BNGA in December 1985, "around Christmas-time," telling Goldberg that he was going to Europe to begin a new and unrelated enterprise. During his absence, according to trial testimony, Lothian had nothing whatsoever to

do with BNGA and received no financial benefit from BNGA's operations. This was a prima facie showing of withdrawal, indicating that Lothian voluntarily and affirmatively ceased his participation in the scheme at the end of December 1985. *See United States v. Lowell,* 649 F.2d 950, 955 (3d Cir.1981) ("[W]here fraud constitutes the 'standard operating procedure' of a business enterprise, 'affirmative action' sufficient to show withdrawal as a matter of law from the conspiracy ... may be demonstrated by the retirement of a coconspirator from the business, severance of all ties to the business, and consequent deprivation to the remaining conspirator group of the services that constituted the retiree's contribution to the fraud.").

Citing *Reisman v. United States,* 409 F.2d 789 (9th Cir.1969), however, the government argues that Lothian's withdrawal showing was insufficient because he did nothing to defeat or disavow BNGA's fraudulent purposes. We disagree. In *Reisman,* we found the defendant's mere resignation as the president and director of a fraudulent land sale enterprise insufficient to terminate his liability for the acts of his co-schemers because he had taken "no affirmative action to disavow or defeat the promotional activities which he had joined in setting in motion." *Id.* at 793 (citing *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)). Withdrawal, however, may also be accomplished by taking " 'definite, decisive and positive' steps to show ... the conspirator's disassociation from the conspiracy." *Loya,* 807 F.2d at 1493 (quoting *United States v. Smith,* 623 F.2d 627, 631 (9th Cir.1980)). The defendant in *Reisman* had not taken "definite, decisive, and positive steps" to disassociate himself from the scheme because he remained a major stockholder. *Reisman,* 409 F.2d at 793. Thus he continued participating in the scheme through his ownership interest. Our conclusion that Lothian made a sufficient showing of withdrawal is consistent with this authority. Lothian retained no such ownership interest upon his resignation. All indications were that Lothian would never have returned to BNGA if not for the failure of his new venture and his resulting penury.

The burden therefore shifted to the government to come forward with evidence that Lothian did not withdraw or that the conduct charged in the mail and wire fraud counts at issue was the result of actions taken by Lothian or his co-schemers prior to his departure. First, the government argues that Lothian's rejoining BNGA at some unspecified time in the spring of 1986 was sufficient to show that Lothian never withdrew. This argument misapprehends the distinction between conspiracy and fraud. Conspiracy punishes a defendant for the mere fact of his agreement to an unlawful objective. Withdrawal negates the element of agreement. Thus evidence that a defendant later rejoined the scheme, which indicates a continued acquiescence in the goals of the conspiracy, sufficiently rebuts withdrawal in the conspiracy setting to allow consideration of the charges by the jury. In *United States v. Lash,* 937 F.2d 1077 (6th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991), *and cert. denied,* — U.S. ——, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992), for example, the Sixth Circuit held that despite the defendant's showing that he had withdrawn from the conspiracy by quitting his job at a fraudulent enterprise, his subsequent acts in joining other fraudulent schemes neutralized his withdrawal. These actions "indicate[d] that his attitude toward the conspiracy was one of *acquiescence* rather than repudiation. The Supreme Court in *Hyde,* 225 U.S. 347, 371–72, 32 S.Ct. 793, 803–04 (1912) ruled that evidence of state of mind after purported withdrawal [from a conspiracy] was for a jury to evaluate." *Id.* at 1085 (emphasis added). In contrast, withdrawal negates a defendant's knowing participation, and thus the element of use of the mails or wires, in these substantive fraud offenses. Whether Lothian continued to agree with BNGA's goals is immaterial to the substantive fraud with which he was charged, and his return to BNGA did not negate his earlier withdrawal.

Second, the government argues that two checks that Lothian received show that he

continued to participate in BNGA after his resignation. BNGA's bank records, which were introduced into evidence at trial, showed that Lothian received a $2,000 check on January 6, 1986, and a $4,100 check on April 7, 1986. There was no evidence as to the purpose of the January 6 check. Therefore it gave rise to a sufficient inference of receipt of continued benefits from the scheme through January 6 to justify denial of the motion for acquittal on counts charging conduct through that date. It was for the jury to decide whether Lothian's disassociation from BNGA before that date was sufficiently definite and positive to constitute a withdrawal.

Additionally, Goldberg testified that when Lothian returned from Europe in the spring of 1986 Goldberg loaned him "around $4,000," which Lothian later repaid through deductions from his commission checks. The government introduced no evidence whatsoever connecting this April 7 check with any prior actions that Lothian took in furtherance of BNGA's fraudulent scheme. Receipt of this check was therefore insufficient to rebut withdrawal as to counts involving conduct between January 6 and April 7. Because Goldberg's testimony also indicates that the loan was roughly contemporaneous with Lothian's return to BNGA, however, the jury could infer that this check marked the beginning of Lothian's second round of participation in BNGA. Thus the court properly denied Lothian's motion for acquittal as to counts involving conduct occurring after April 6, 1986.

■■■ Determining the dates of Lothian's withdrawal from and rejoining of BNGA, however, does not end our analysis. As we discussed above, withdrawal from a fraudulent scheme will not furnish a complete defense where the use of the mails or wires occurring after the withdrawal is the foreseeable result of actions taken by the defendant or co-schemers during the defendant's participation in the scheme. We must therefore examine each count for which Lothian argues he is entitled to acquittal to determine whether the particular charged use of the mails, wires, or inter-

state transport during Lothian's absence was the result of actions that he or his co-schemers took before he ceased his participation at BNGA.

Count 1 charges Lothian with mail fraud for the February 15, 1986, mailing of investment forms to Harry Liaros. Liaros testified that his first contact with BNGA was in January or February 1986, when Gary Kummer called him on the telephone. Kummer did not join BNGA until after Thompson's arrival in early February 1986. The mailing to Liaros, therefore, was not a foreseeable result of Lothian's participation in the scheme prior to January 6, 1986. Count 2 charges Lothian with mail fraud for the March 21, 1986, mailing of a transaction confirmation to Perry Gusic, a mailing that occurred during Lothian's absence from BNGA. This conduct was not a foreseeable result of Lothian's involvement in BNGA because Gusic's first contact with BNGA was in March 1986. Count 3 charges Lothian with mail fraud for the March 25, 1986, mailing of a transaction confirmation to Shirley Ryberg. Ryberg's first contact with BNGA was in February 1986. The mailing to Ryberg was therefore not a foreseeable result of Lothian's participation in BNGA. Lothian was therefore entitled to acquittal on these counts of mail fraud.

Count 4 charges Lothian with mailing investment forms on April 14, 1986, to Mark Freeman. Count 5 charges Lothian with mailing a transaction confirmation on April 22, 1986, to Ronald Schaupeter. These mailings occurred at a time during which the jury could have concluded Lothian was participating in the scheme. Lothian's motion for acquittal on these mail fraud counts was therefore properly denied.

Count 13 and Count 16 charge Lothian with wire fraud for two telephone calls to Edward Landreth. The March 10, 1986, call charged in Count 13 represents Landreth's first contact with BNGA, made at a time Lothian was not a participant in the scheme. Lothian is entitled to acquittal on this count. The May 8, 1986, telephone call charged in Count 16, however, occurred

during a period when the jury could have concluded Lothian was participating in the scheme, and therefore the motion for acquittal on count 16 was properly denied. Count 15 charges Lothian with wire fraud for an April 25, 1986, telephone call to Joy Lynne Brugge. Brugge was first contacted in November 1985, a time at which Lothian was participating in the scheme. The conduct charged in this count was the foreseeable result of Lothian's participation in the scheme, and therefore his motion for acquittal was properly denied.

In sum, Lothian is entitled to acquittal on Counts 1, 2, 3, and 13 because the government failed to rebut his prima facie showing of withdrawal. The remaining mail and wire fraud counts that he challenges on the basis of withdrawal—Counts 4, 5, 15, and 16—were properly submitted to the jury.

### C. Property Fraud

Lothian also argues that his withdrawal from BNGA entitled him to acquittal on three counts charging interstate transportation of fraudulently obtained property. Alternatively, he contends that the evidence was insufficient to support his conviction on these counts because at the time the property crossed state lines he was not a participant in the scheme and therefore had no knowledge that the property was fraudulently obtained. We reject both these arguments.

 The elements of interstate transportation of fraudulently obtained property under 18 U.S.C. § 2314 are (1) knowledge that property valued at at least $5,000 has been obtained by fraud, and (2) transporting that property or causing it to be transported in interstate commerce. *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1947); *United*

*States v. Olano,* 934 F.2d 1425, 1430 (9th Cir.1991), *cert. granted,* —— U.S. ——, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992). A defendant who participates in the fraud by which the property was obtained may be held liable despite lack of intent or knowledge that interstate commerce would be used. *United States v. Masters,* 456 F.2d 1060, 1061 (9th Cir.1972); *see United States v. Roselli,* 432 F.2d 879, 890–91 (9th Cir.1970) (transportation requirement is solely jurisdictional and statute aimed at fraud itself), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971); *United States v. Kibby,* 848 F.2d 920, 923 (8th Cir.1988) (citing *United States v. Ludwig,* 523 F.2d 705, 707 (8th Cir.1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86 (1976)). Moreover, because vicarious liability principles apply among participants in a fraudulent scheme, a defendant who is a knowing participant is liable for his co-schemers' interstate transport of property occurring during his membership in the scheme. *See United States v. Vaccaro,* 816 F.2d 443, 455 (9th Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987).

As we concluded above, the evidence was sufficient to establish that Lothian participated in the fraud at BNGA through January 6, 1986, and after April 7, 1986. Because the three disputed property fraud counts involve victims first contacted prior to January 6, 1986, or property transported after April 7, 1986, we need not consider whether and how the withdrawal defense might apply to property fraud. The evidence was sufficient to support Lothian's conviction on these property fraud counts.[5]

### D. Jury Instructions

Lothian contends that he is entitled to a new trial because of improper jury instruc-

---

5. Count 23 involves a $19,000 check sent by Perry Gusic to BNGA on April 13, 1986. Count 24 involves a $5,661 check sent by Robert Moulton to BNGA on April 16, 1986. There was sufficient evidence in the record to indicate that Lothian rejoined BNGA on April 7, 1986, and was a participant in the scheme on these dates. The evidence was thus sufficient to show both his knowledge that this money was fraudulently obtained and his participation in the interstate

transport. Count 27 involves checks totalling $21,900 sent by Joy Lynne Brugge on January 16, 1986. Although Lothian was absent from BNGA at this time, he was a participant in the scheme during November 1985, when Brugge was first contacted by BNGA and fraudulently solicited. The evidence was thus sufficient to support his liability as a participant in the fraud that eventually resulted in the transportation of the checks.

tions concerning the withdrawal defense. The court instructed the jury that (1) to be liable for the various fraud offenses the defendant must be a member of a fraudulent scheme; (2) once joining a scheme a defendant is a member until he withdraws; (3) withdrawal can be demonstrated by a definite positive step indicating the defendant is no longer a member; and (4) a defendant who is a member of a fraudulent scheme is liable for the foreseeable use of the mails or wires. The instructions were an accurate statement of the law as it pertains to withdrawal from a fraudulent scheme.

Lothian proposed the following instruction, which the district court rejected:

> If you find that Mr. Lothian withdrew from the charged scheme at any time, he is not ... responsible for any acts committed after that withdrawal. However, you could find that he later rejoined the scheme; if you do find this, Mr. Lothian can be held accountable for acts committed after he rejoined the scheme.
>
> Even if you find that Mr. Lothian did rejoin the scheme, however, he must still be found not guilty of any of the counts which charge mail or wire fraud that are based on mailings or telephone calls which occurred after he withdrew and before he rejoined.

Clerk's Record 163 at 28.

■ A defendant is entitled to jury instructions reflecting the theory of defense as long as they are supported by the law and have some foundation in the evidence. *United States v. Escobar de Bright*, 742 F.2d 1196, 1198 (9th Cir.1984). We conclude, in light of our analysis of how the withdrawal defense applies to mail and wire fraud, that the proposed instruction was not supported by the law. No mention is made of a defendant's liability after withdrawal for uses of the mails and wires that are the foreseeable result of the defendant's participation in the scheme. Moreover, the proposed instruction was not relevant to the property fraud counts. The court did not err in rejecting the proposed instruction.

## II. *Fraudulent Intent*

■ Lothian argues that there was insufficient evidence of his "knowing participation" in a fraudulent scheme to support his conviction. To sustain a conviction under the mail and wire fraud statutes, there must be sufficient evidence to show that the defendant "willful[ly] participate[d] in a scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *United States v. Price*, 623 F.2d 587, 591 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), *overruled on other grounds, United States v. De Bright*, 730 F.2d 1255 (9th Cir.1984). However, "[p]articipation in furtherance of a fraudulent scheme does not, by itself, justify a conviction unless the defendant's knowledge of the fraudulent purpose can be shown." *Id.* In reviewing the jury's verdict for sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt that Lothian's participation in the fraud at BNGA was knowing. *See United States v. Adler*, 879 F.2d 491, 495 (9th Cir.1988). We conclude that the government introduced sufficient evidence to show that Lothian was aware that BNGA had a fraudulent purpose.

■ Knowledge of fraudulent purpose, as an aspect of intent to defraud, need not be shown by direct evidence, but may also be established by circumstantial evidence. *See United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir.1990). "It is often difficult to prove fraudulent intent by direct evidence and it must be inferred in such cases from a pattern of conduct or a series of acts, aptly designated as badges of fraud." *United States v. Krohn*, 573 F.2d 1382, 1386 (10th Cir.), *cert. denied*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978). The government introduced evidence of Lothian's conduct that amounted to "badges of fraud." Lothian made extensive misrepresentations to customers concerning BNGA's experience, reputation, track record, size, and research activities. Lothian was aware that before BNGA moved into

office space in October 1985 Goldberg had not hedged customers' investments, and that hedging during the spring and summer of 1986 was inadequate. Lothian was an insider who occupied a position of responsibility at BNGA and later at Sawyer, supervising a salesroom "permeated" by lies. Lothian on at least one occasion misrepresented to an investor the necessity of buying a larger lot of palladium than was in reality required, and as a consequence the investor bought 25 ounces more than he had originally desired. Viewing this evidence in the light most favorable to the government, a rational trier of fact could conclude that Lothian was aware of the fraudulent purpose of the business.

## III. *Evidence of Related Schemes*

■ Finally, Lothian attacks the admission of evidence concerning First American Currency and Schoolhouse Coins, two other fraudulent schemes in which Goldberg and Thompson were involved. He contends that this evidence was irrelevant and unfairly prejudicial to him because it was never tied to BNGA and led the jury to infer fraudulent intent on his part solely by virtue of his association with people who had been involved in other fraudulent schemes.

Vickie Anderson–Rasi was a bookkeeper at First American Currency, where Thompson worked as a sales manager before joining BNGA. She testified that postal inspectors shut First American down in December 1985, raising concerns among the staff about the company's legitimacy. Michael Curren, a United States postal inspector, testified simply that he had taken part in an investigation of First American.

Wayne Pederson, who was a sales manager at Schoolhouse Coins, testified about Thompson's and Goldberg's purchase of that enterprise in the spring of 1986. Pederson testified that Schoolhouse Coins was a fraudulent telemarketing boilerroom selling numismatic coins and that he had pled guilty to fraud for his participation in the scheme. According to Pederson, he had not hidden the fraudulent nature of the enterprise from Thompson, and Thompson

knew when he and Goldberg purchased Schoolhouse Coins that it was "out of trust," that is, it had sold interests in coins that exceeded the amount of coins it had purchased on its customers' behalf.

Although we generally review the district court's evidentiary rulings for abuse of discretion, our review is for plain error when a proper objection has not been made at trial. *United States v. Kessi,* 868 F.2d 1097, 1107 (9th Cir.1989). At the beginning of the trial the district judge stated: "An objection by one defendant is an objection by all. And the ruling is the same regarding all of them unless I say otherwise." Thompson objected to admission of the evidence concerning First American Currency; however, neither Lothian nor any of his co-defendants who had not participated at First American objected to Anderson–Rasi's testimony. Again, only Thompson objected to Curren's limited testimony that he was involved in a postal inspection of First American. Thompson's objections to the use of the First American evidence to show a common fraudulent scheme were sufficient to constitute objections by Lothian on the same ground. These general relevancy objections did not, however, constitute an objection that the evidence was not applicable to Lothian because he had not participated in First American's activities. That issue was never called to the district court's attention, and to the extent that Lothian now raises it we review for plain error.

"A plain error is a highly prejudicial error affecting substantial rights." *United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986) (quoting *United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979)). Here, the additional testimony concerning First American did not affect Lothian's substantial rights. As indicated in our discussion above, there was an abundance of evidence linking Lothian with the fraudulent scheme at BNGA and showing his own fraudulent intent, and the addition of the First American testimony could not have affected his substantial rights. By the same token, even were there error in the admission of the testimony concerning the Schoolhouse Coins enterprise, it was at

most harmless error, because it did not affect Lothian's substantial rights. *See* Fed.R.Crim.P. 52(a) (harmless error is "[a]ny error ... which does not affect substantial rights"), and the facts set forth in the sections entitled BACKGROUND and *Fraudulent Intent, supra,* which overwhelming indicate Lothian's guilt.

## CONCLUSION

Because the government did not rebut Lothian's showing of withdrawal after January 6, 1986, the court erred in submitting to the jury counts charging use of the mails and wires between that date and April 7, 1986, that involved customers contacted for the first time during Lothian's absence. We therefore REVERSE Lothian's conviction on counts 1, 2, 3, and 13. There was adequate evidence in the record to support a finding that Lothian's involvement in the fraudulent scheme at BNGA was knowing. We REMAND for resentencing to the extent necessary to comply with this opinion. Furthermore, we find no reversible error in the admission of evidence of other fraudulent schemes in which Thompson was involved. We therefore AFFIRM Lothian's conviction on the remaining counts.

AFFIRMED in part, REVERSED in part, and REMANDED.