141 F.3d 1181
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
United States of America, Plaintiff-Appellee,
v.
George LOVETT, Richard G. Randall, and Donald A. DiMartini,
Defendants-Appellants.
 No. 96-10488, 96-10507, 96-10508.
D.C. No. CR-95-00328-EHC.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 14, 1998.
Decided Feb. 11, 1998.
 
 Appeal from the United States District Court for the District of Arizona Earl H. Carroll, District Judge, Presiding.
 Before CHOY, SCHROEDER, and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 Introduction
 
 2
 Appellants Donald A. DiMartini ("DiMartini"), Richard G. Randall ("Randall"), and George Lovett ("Lovett") appeal their jury conviction for mail fraud and wire fraud stemming from their operation of American Choice Corporation ("ACC"), a telemarketing company which solicited customers to participate in purchasing promotions.
 
 
 3
 We AFFIRM in all respects.
 
 Analysis
 I. Separate Trials
 
 4
 Appellants argue that they were improperly denied separate trials. However, Appellants failed to preserve any potential error for an appeal.
 
 
 5
 It is well established that a motion for severance must be renewed at the close of evidence or it is waived. U.S. v. Restrepo, 930 F.2d 705, 711 (9th Cir.1991). Granted, the renewal requirement is considered an "unnecessary formality" as long as the movant demonstrates "diligent pursuit." U.S. v. Kaplan, 554 F.2d 958, 965-66 (9th Cir.1977). Yet other than a general assertion that the district court made it clear before and throughout the trial that it would not grant a motion to sever, Appellants fail to offer specific instances of "diligent pursuit." See, e.g., U.S. v. Vasquez-Velasco, 15 F.3d 833, 845 (9th Cir.1994).
 
 II. Motion to Suppress
 
 6
 Appellants argue that the Government impermissibly exceeded the scope of the search warrant by seizing virtually all of ACC's records. We disagree.
 
 
 7
 In this case, there was probable cause to believe that the alleged fraud permeated ACC in its entirety, justifying the general seizure which shut down the telemarketing operation. See U.S. v. Offices Known as 50 State Distrib. Co., 708 F.2d 1371, 1374 (9th Cir.1983).
 
 
 8
 Appellants respond that 50 State Distrib. Co. addressed whether the search warrant itself was overbroad, not whether the execution exceeded the warrant's terms. Appellants argue that the terms of the warrant were limited to eight named victims.
 
 
 9
 However, the district court correctly concluded that the word "victim" as used in the search warrant was not intended to limit the documents seized to those relating to the named victims who had been previously defrauded by ACC. The Government was also interested in how the operations were conducted, who else had been contacted, and who might be contacted in the future. Accordingly, the affidavit depicted an entire business permeated with fraud which had victimized at least 47 people, only eight of whom were named.
 
 
 10
 III. Refusal to Grant Immunity to Defense Witnesses
 
 
 11
 Appellants assert that they were denied a fair trial because the Government refused to grant immunity to proposed defense witnesses Mary "Mimi" Bundy ("Bundy"), Donna Anderson ("Anderson"), and Doris Warren ("Warren"), leading each to invoke her Fifth Amendment right.
 
 
 12
 Generally, criminal defendants cannot compel the Government to grant immunity to a witness. U.S. v. Young, 86 F.3d 944, 947 (9th Cir.1996). However, defendants qualify for an exception to this rule upon showing that: 1) the testimony was relevant; and 2) the Government distorted the judicial fact-finding process by denying immunity. Id.
 
 
 13
 Nonetheless, Appellants fail to satisfy this two-part test.
 
 
 14
 IV. Exclusion of Mary Muchmore's Hearsay Testimony
 
 
 15
 Appellants planned to have Mary Muchmore testify regarding statements made by Bundy which included an admission that she had failed to listen to tapes of ACC sales representatives.
 
 
 16
 Although the testimony would have been hearsay, Appellants argued that Bundy's admission constituted a statement against her penal interest under Rule 804(b)(3) of the Federal Rules of Evidence. Independently, Appellants argued that Bundy's admission should have been admitted as proof of "third-party culpability." See Perry v.. Rushen, 713 F.2d 1447 (9th Cir.1983).
 
 
 17
 We find no merit to these claims.
 
 V. Conduct of District Judge
 
 18
 Appellants allege that the district judge exhibited a high level of bias against them and a key defense witness, Alan Pick ("Pick"). Although the district judge demonstrated irascibility, he did not jeopardize Appellants' right to a fair trial. Significantly, most of the judge's remarks and conduct occurred outside the presence of the jury. For example, the jury was not present for the exchange concerning Pick's honesty in which the judge unexpectedly left the bench. Neither was the jury present when the judge showed little regard for this court. "I may be in serious trouble with the Ninth Circuit, and that is not my problem or my concern, I try to do what is right."
 
 
 19
 Not only were these comments made outside the jury's presence, they did not amount to actual bias. See U.S. v. Rutgard, 116 F.3d 1270 (9th Cir.1997). Moreover, any bias which the jury might have detected was cured by the instruction to the jury not to read into anything that the judge had said or done. See U.S. v. Sanchez-Lopez, 879 F.2d 541, 553 (9th Cir.1989).
 
 
 20
 In short, while the district judge's remarks and behavior were less than admirable, there is no clear indication of actual bias or that the jury perceived partiality.
 
 VI. Jury Instructions
 A. Corporate Officer Liability Instruction
 
 21
 Appellants argue that the district court's jury instruction on officer liability violates U.S. v. Gibson, 690 F.2d 697, 701 (9th Cir.1982). But the language chosen by the district court more than adequately captures the standard in Gibson.
 
 B. "Puffing" Instruction
 
 22
 Appellants argue that it was improper for the district court to exclude their "puffing" instruction which distinguished exaggerated statements of opinion as a sales technique from false statements of fact.
 
 
 23
 However, in U.S. v. Gay, 967 F.2d 322, 329 (9th Cir.1992), this court upheld the rejection of a similar "puffing" instruction, finding that a "good faith" instruction adequately conveyed the gist of a "puffing" defense. Therefore, the district court's inclusion of an instruction on good faith as a complete defense made it unnecessary in this case to include Appellants' "puffing" instruction.
 
 C. Lovett's Withdrawal Instruction
 
 24
 Appellant Lovett argues that the district court misstated the law when it included a jury instruction requiring him to take some "affirmative act" in order to prove withdrawal.
 
 
 25
 The district court issued the following instruction on withdrawal:
 
 
 26
 It is a defense to Count 2 through 21 of the indictment that a defendant withdrew from the scheme.
 
 
 27
 In order to withdraw from the scheme, a defendant must take some definite, decisive, and affirmative action to disavow himself from the scheme or to defeat the goal or purpose of the scheme.
 
 
 28
 Merely stopping activities or cooperation or merely being inactive for a period of time is not sufficient to constitute the defense of withdrawal....
 
 
 29
 In deciding if a defendant took a step to disavow or defeat the scheme, you may consider several factors including whether the defendant intentionally alerted law enforcement to the scheme, whether the defendant told others in the scheme that his participation had ended, whether the defendant took steps to correct prior assistance to the group, and whether the defendant attempted to remedy any past act, or attempted to prevent any further progress of the scheme.
 
 
 30
 Lovett argues that the above instruction contradicts the law in U.S. v. Lothian, 976 F.2d 1257, 1261 (9th Cir.1992), which defines withdrawal as follows: "To withdraw from a conspiracy a defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take 'definite, decisive, and positive' steps to show that the [defendant's] disassociation from the conspiracy is sufficient."
 
 
 31
 Although the district court in this case changed the language and sequence somewhat, it adequately captured all three methods of withdrawal. Therefore, the district court did not misstate the law in its withdrawal instruction.
 
 
 32
 However, the question remains whether the withdrawal instruction as a whole was misleading. Lovett correctly points out that an employee's resignation, after which he receives no financial benefit from the company, is prima facie evidence of withdrawal. Lothian, 976 F.2d at 1264.
 
 
 33
 Unfortunately, the district court in this case did not include resignation as an example of withdrawal. Nonetheless, we do not believe that the district court abused its discretion. Despite its choice of examples, the district court did not expressly exclude resignation as evidence of withdrawal. Apparently no better language was proposed, and this court in Lothian did not require that resignation be expressly highlighted for the jury. Hence, the withdrawal instruction is not a ground for reversal, even though it was less than ideal.
 
 VII. Government Conduct During Closing
 
 34
 Appellants requested a mistrial because the Government showed the jury during closing two exhibits which were not in evidence. First, Appellants complained about the Government's display of Exhibit 449, a complaint letter written by Louis Benthack. But this error was not inflammatory.
 
 
 35
 Additionally, Appellants complain about the Government's display of two checks showing payment to Lovett. One check had been admitted into evidence as part of Exhibit 21C. Although the other check had not been admitted, that payment to Lovett was evidenced elsewhere--in Exhibit 46E. Thus, it was not prejudicial when the jury asked a question about the check.
 
 VIII. Sufficiency of the Evidence
 
 36
 Appellants attempt to undermine the validity of the jury's verdict. First, they question the credibility of several Government witnesses. But we find no basis to declare these witnesses per se unreliable, even if some of them testified pursuant to plea agreements with the Government. Furthermore, Appellants are unconvincing in arguing their lack of knowledge of their sales representatives' misrepresentations.
 
 IX. Sentence Enhancement
 
 37
 Section 3A1.1 of the U.S. Sentencing Guidelines instructs courts to increase a sentence by two levels "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct...." U.S Sentencing Guidelines Manual § 3A1.1(b) (1997).
 
 
 38
 Appellants confuse the issue by arguing that § 3A1.1 does not apply to them under U.S. v. Castellanos, 81 F.3d 108 (9th Cir.1996). There, this court held:
 
 
 39
 The appellate courts have consistently refused to find a class of victims to be particularly susceptible to criminal conduct simply because they were statistically more likely to fall prey to defendant's crime....
 
 
 40
 Especially in cases involving some kind of scheme to defraud, the criminal will typically direct his activities toward those persons most likely to fall victim to the scheme. But all defendants targeting such victims do not necessarily merit a sentence enhancement under § 3A1.1. Otherwise, all but the most unthinking of criminal defendants would be candidates for upward adjustment under § 3A1.1. Instead, the victims to whom § 3A1.1 applies are those who are in need of greater societal protection.
 
 
 41
 Id. at 110-11.
 
 
 42
 Appellants imply that although many of the victims were elderly, that fact alone is insufficient for enhancement under Castellanos--even if statistics show that the elderly are more likely to participate in telemarketing activities.
 
 
 43
 But this court's concern in Castellanos was made in reference to the "particularly susceptible" prong, not the "unusually vulnerable" prong set forth in the guidelines. With regard to the latter, this court noted that the distinction in § 3A1.1(b) between "unusually vulnerable" and "particularly susceptible" suggests that the characteristic of age "may per se render a victim worthy" of special protection. Id. at 110. Therefore, the relevant inquiry in this case should not be whether the elderly per se as a class constitute vulnerable victims, but whether the Appellants targeted the elderly.
 
 
 44
 Indeed it appears that the Appellants deliberately targeted the elderly. For example, Appellants specifically suggested that sales representatives "cherry pick" customers with older-generation names like Hazel, Mabel, and Gladys. Moreover, there were various questions devised in order for representatives to assess the age of prospective consumers.
 
 
 45
 Although the precise percentage of victims that were elderly is in dispute, this case is unlike the situation "where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." (U.S. Sentencing Guidelines at Comment 2.) Here, Appellants' victimization of the elderly was much more than coincidence, justifying sentence enhancement under § 3A1.1.
 
 X. DiMartini's Speedy Trial Right
 
 46
 Under 18 U.S.C. § 3161(c)(1), a defendant's trial must commence within 70 days from the date of the indictment or initial court appearance, whichever occurs later. Since the last codefendant was arraigned on January 25, 1996, DiMartini calculates that he should have been tried by April 4, 1996.
 
 
 47
 In postponing the trial from February 14, 1996 through May 21, 1996, the district court relied on § 3161(h)(8)(A)--the "ends of justice" exception. On appeal, DiMartini argues that the district court failed to satisfy this exception's requirements. See U.S. v. Clymer, 25 F.3d 824, 828 (9th Cir.1994).
 
 
 48
 Regardless, we need not decide whether the district court satisfied the "ends of justice" exception. We find an alternative basis for excludable delay. Specifically, § 3161(h)(1)(F) excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." See U.S. v. George, 85 F.3d 1433 (9th Cir.1996).
 
 
 49
 On January 24, 1996, DiMartini filed a motion to suppress evidence. This motion was not decided until 61 days later, on March 26, 1996. Under § 3161(h)(1)(F), these 61 days were properly excludable. Thus, DiMartini's right under the Speedy Trial Act was not violated.
 
 
 50
 In a footnote, DiMartini argues that his right to a speedy trial under the Sixth Amendment to the U.S. Constitution was also violated. Applying the four-factor test given in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we find no constitutional violation. In particular, we note that DiMartini's failure to prove prejudice pursuant to Barker is not excused by Doggett v. U.S., 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).
 
 XI. Lovett's Closing Argument
 
 51
 Appellant Lovett contends that the district court improperly restricted his closing argument. He wanted to argue that the Government's failure to play recordings of his sales pitches suggests that the tapes would have shown that the Appellant had not made any misrepresentations.
 
 
 52
 Granted, the Government's failure to produce relevant evidence within its control gives rise to an inference that the evidence would be unfavorable to it. U.S. v. Tory, 52 F.3d 207, 211 (9th Cir.1995). However, the district court did not abuse its discretion in finding that there was no evidence in the record that tapes of Lovett's sales even existed. Although other sales representatives had testified about their individual experiences with being recorded, there was no direct evidence that Lovett himself had been recorded. When asked, no witness had heard tapes of Lovett specifically.
 
 
 53
 XII. Lovett's Cross-Examination of Special Agent David Ramey
 
 
 54
 Appellant Lovett contends that the district court erred in limiting his cross-examination of Special Agent David Ramey ("Ramey"). However, in cross-examining Ramey, Lovett was not attempting to impeach the witness or directly contradict the Government's evidence. More importantly, Appellants concede that Ramey could have been called as a defense witness and questioned then.
 
 
 55
 In short, this was not a situation where Lovett was precluded from presenting a defense; the district court simply controlled the method by which Lovett raised his defense.
 
 
 56
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3