**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Odell FOX, Defendant–Appellant.**

**No. 97–30366.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1999.

Decided Sept. 2, 1999.

Michael R. Spann (Argued) and Kevin R. Feldis (On the Briefs), Bogle & Gates, Anchorage, Alaska, for the defendant-appellant.

Stephan A. Collins, Assistant United States Attorney, Anchorage, Alaska, for the plaintiff-appellee.

Before: HUG, Chief Judge, TROTT, and TASHIMA, Circuit Judges.

TROTT, Circuit Judge:

## OVERVIEW

Odell Fox ("Fox") appeals his jury conviction and sentence for one count of conspiracy to possess, with intent to distribute, a controlled substance in violation of 21 U.S.C. § 846. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291, and we affirm the conviction and sentence.

## BACKGROUND

In 1997, the Federal Bureau of Alcohol, Tobacco, and Firearms (the "ATF") and the Anchorage Police Department (the "APD") began investigating Sidney Potts ("Potts") for distributing crack cocaine from his home. Using confidential informants, wired with microphones, the ATF and the APD tape recorded numerous drug transactions involving Potts. On May 1, 1997, confidential informants Michelle Gates ("Gates") and Clark Ramsey ("Ramsey") were given "prerecorded" money and instructed to go to Potts's home and purchase one-quarter ounce of crack cocaine from Potts. Gates, who was pregnant at the time, wore an electronic transmitting device.

Gates and Ramsey went to Potts's home and Fox opened the door. When Gates asked to see Potts, Fox led Gates and Ramsey back to Potts's room. Fox lived with Potts and apparently acted as the "doorman," answering the door and directing would-be drug purchasers to back rooms. Gates told Potts that she wanted to purchase one-quarter ounce of cocaine and have him "cook" it for her. Potts began calling his suppliers trying to get the requested cocaine. During that time, a man named Willie also approached Potts about purchasing one-quarter ounce of cocaine as well. Unable to get the cocaine through his phone suppliers, Potts instructed Fox to call Fox's brother to determine whether Fox's brother would sell Potts the desired cocaine.

Subsequently, Fox, Potts, Gates, and Ramsey got into a car and drove to Fox's brother's house. Once they got there, Fox got out of the car and went into the house to purchase the drugs. Potts gave Fox enough money to purchase a half-ounce of crack cocaine and told him to "make it hard" and to get "separate containers for the two 7's." Fox returned shortly thereafter and told Potts that his brother would not sell him that much, but would sell him a half-gram. Potts gave Fox $60 and told him to purchase the half-gram. Fox returned with a half-gram of crack cocaine, which Fox, Potts, Ramsey, and Gates all smoked before leaving.

Potts then decided to go to another drug dealer, who lived near Jewel Lake, to get the drugs, but Fox asked to be taken back to Potts's home. After dropping him off, Potts, Gates, and Ramsey went to Jewel Lake to purchase the desired cocaine. At a residence near Jewel Lake, Potts purchased 13.6 grams of powder cocaine. As they headed back to Potts's house, police

pulled the car over, found the drugs and arrested Gates, Ramsey, and Potts. At the same time, APD officers arrested Fox at Potts's home.

Fox was indicted for one count of conspiracy to possess, with intent to distribute, a controlled substance in violation of 21 U.S.C. § 846. A jury found Fox guilty. At sentencing, Fox argued that he should only be sentenced based on the one-half gram of crack cocaine he purchased for Potts. The district court found that Fox's relevant conduct included the entire 13.6 grams of cocaine. Fox also objected to the district court's decision to sentence him as though the cocaine powder had been converted into crack cocaine. The district court held that Fox knew that Potts would cook the powder cocaine into crack and accordingly sentenced Fox to 84 months. This appeal followed.

## DISCUSSION

### I. Relevant Conduct

■ Fox argues that the district court erred in finding, for sentencing purposes, that his relevant conduct included 13.6 grams of cocaine. The district court's factual findings in the sentencing phase are reviewed for clear error, but must be supported by a preponderance of the evidence. *United States v. Whitecotton*, 142 F.3d 1194, 1197 (9th Cir.1998).

Initially, Fox argues that the scope of the conspiracy agreement did not include 13.6 grams of cocaine. Fox does not dispute that an agreement to purchase drugs existed; he argues only that it did not cover 13.6 grams of cocaine. "The district court may only sentence a defendant for relevant conduct within the scope of the defendant's agreement that was reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake jointly." *United States v. Gutierrez–Hernandez*, 94 F.3d 582, 585 (9th Cir.1996) (citing U.S.S.G. § 1B1.3, Application Note 1 (as amended Nov. 1, 1990)).

■ The district court found that Fox had agreed to purchase a half-ounce of crack cocaine. This finding was not clearly erroneous. At trial, testimony proved that Gates and Willie were each attempting to purchase one quarter ounce of crack cocaine from Potts. Although Fox arguably did not know the amount of crack both Gates and Willie wanted at that point, he called his brother and then got in the car and drove to his brother's house with Potts, Gates, and Ramsey to buy drugs. When they arrived at Fox's brother's house, Potts gave Fox enough money to purchase a half-ounce of crack cocaine and told him to "make it hard" and to get "separate containers for the two 7's," in other words to get two packages each containing seven grams of crack cocaine.[1] At that point, Fox clearly knew the scope of the conspiracy and by taking the money and going into the apartment to purchase the a half-ounce of crack cocaine, he agreed to participate in that conspiracy. Based on these facts, the district court correctly found that the scope of the conspiracy was a half-ounce of crack cocaine and that Fox agreed to participate in that conspiracy.

■ Fox argues that he withdrew from the conspiracy after he was unable to purchase the drugs at his brother's house. A conspirator can withdraw from a conspiracy by: (1) disavowing the unlawful goal of the conspiracy; (2) affirmatively acting to defeat the purpose of the conspiracy; or (3) taking "definite, decisive, and positive" steps to disassociate himself from the conspiracy. *United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir.1992). However, a defendant remains liable for actions taken before withdrawing from the conspiracy. *Id.* at 1262.

■ Fox does not argue that he disavowed the conspiracy or took steps to defeat its purpose. Fox only argues that he withdrew from the conspiracy by asking to

1. Twenty-eight grams of cocaine equals one ounce; thus seven grams equals one-quarter ounce.

be taken back to Potts's home after he was unable to purchase drugs at his brother's house. This argument lacks merit. Initially, Fox violated § 846 when he took the money from Potts and walked into his brother's house to purchase the drugs. *See United States v. Gil,* 58 F.3d 1414, 1423 & n. 5 (9th Cir.1995) (holding that in order to prove a conspiracy in violation of § 846, the government must prove (1) an agreement to commit a crime, and (2) the defendant's knowledge of the conspiracy's objectives and an intent to further them).[2] Consequently, even if he withdrew shortly thereafter, his relevant conduct includes the half-ounce of crack cocaine he intended to purchase when he first entered the house. *See United States v. Loya,* 807 F.2d 1483, 1493 (9th Cir.1987). Additionally, the district court found that Fox asked to be taken home because he was afraid of being apprehended and that he did not take steps to disassociate himself from the conspiracy. That finding was not clearly erroneous. The record reflects that after failing to purchase the drugs at his brother's house, Fox got in the car and became suspicious that they were being followed. Moreover, Fox did not disassociate himself from the conspiracy but went back to the house where the conspiracy began and where Potts was sure to return. Fox did not withdraw from the conspiracy, he just completed his role in it.

## II. Conversion of Cocaine Powder into Crack Cocaine

■ Fox argues that the district court erred in converting the seized cocaine powder into crack cocaine for sentencing purposes. The district court's interpretation of the Sentencing Guidelines is reviewed de novo. *United States v. Bailey,* 139 F.3d 667, 667 (9th Cir.1998). A district court's determination of quantity of drugs involved is a factual issue reviewed for

clear error. *Whitecotton,* 142 F.3d at 1197.

■ Initially, Fox argues that the Sentencing Guidelines prohibit the conversion of cocaine powder to crack cocaine. We have not previously addressed this issue. However, the Fourth, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits have all affirmed the conversion of powder cocaine to crack cocaine for sentencing purposes when the object of the conspiracy involved the conversion or the conversion was foreseeable. *See United States v. Hunter,* 145 F.3d 946, 952 (7th Cir.1998); *United States v. Quinn,* 123 F.3d 1415, 1425 (11th Cir.1997); *United States v. Ford,* 88 F.3d 1350, 1368 (4th Cir.1996); *United States v. Alix,* 86 F.3d 429, 436–37 (5th Cir.1996); *United States v. Bingham,* 81 F.3d 617, 628–29 (6th Cir.1996); *United States v. Robertson,* 45 F.3d 1423, 1444 (10th Cir.1995); *United States v. McMurray,* 34 F.3d 1405, 1414 (8th Cir.1994). We agree with this reasoning and align ourselves with these circuits.

■ In sentencing a person convicted of a drug related conspiracy, the sentencing court must determine the quantity and type of drugs, which were the object of the conspiracy. U.S.S.G. § 2D1.1 Application Note 12 (1998). In this case, it was clear that the object of the conspiracy was crack cocaine, not powder cocaine. As explained above, Fox knew that Potts wanted to purchase crack cocaine. Indeed, Fox attempted to purchase crack cocaine for Potts at Fox's brother's house. The object of the conspiracy was made clear to Fox when Potts told him to "make it hard," in other words to make it crack cocaine. At sentencing, there was also testimony that Fox had witnessed Potts cook powder cocaine into crack cocaine at his home. Additionally, a pot and baking soda used for

---

**2.** Because Fox violated § 846 with his own actions, we need not look at whether it was foreseeable that Potts would go to another dealer in an attempt to purchase the drugs.

However, the record clearly establishes that Fox knew Potts was going to another dealer at Jewel Lake to purchase the half-ounce for Gates and Willie.

cooking cocaine powder into crack cocaine were found at Potts's home and entered into evidence. Based on this, the district court correctly found that the scope of the agreement was to purchase a half-ounce of crack cocaine and therefore correctly sentenced Fox based on the objective of the conspiracy.

 Fox also argues that the district court lacked a basis for determining the conversion ratio from powder cocaine to crack cocaine. At sentencing, the government offered the testimony of Officer Bruce Bryant, who testified that he had received training on conversion of cocaine powder to crack cocaine at the police academy and from the chief chemist at the Alaska Crime Lab, and that he had witnessed the conversion of powder cocaine to crack three times on the street. Bryant testified that in a laboratory there is typically a ten percent weight loss when cooking cocaine powder into crack, but that on the street one gram of powder cocaine typically converts into one gram of crack cocaine, because street cookers use baking soda and tap water to increase the weight. There was also testimony that Potts did not measure the baking soda he used and that the crack he cooked typically had bubbles, which would increase the weight. Based on this testimony, the district court reduced the weight of the cocaine powder ten percent and sentenced Fox based on

the reduced weight as though it were crack cocaine. Fox argues that Bryant had only witnessed crack being cooked three times on the street and had not weighed it before or after it was cooked. However, that goes to the credibility of the testimony, which the district court was entitled to determine. Moreover, Bryant testified that in a laboratory conversion there is a weight loss of ten percent. On these facts, the government fulfilled its burden to prove the conversion rate by a preponderance of the evidence.[3]

## CONCLUSION

 Because the testimony at trial established that the scope of the conspiracy was to purchase a half-ounce of crack cocaine, we affirm Fox's sentence and conviction.[4]

**AFFIRMED.**

---

**3.** Pursuant to the drug table, Fox was given an offense level of 26 based on five to twenty grams of crack cocaine. U.S.S.G. § 2D1.1(c). Using a ten percent loss of weight, the district court concluded that the 13.6 grams of powder cocaine when added to the half gram purchased at Fox's brother's house converted to 12.7 grams of crack cocaine. However, even if the district court had used a sixty percent loss of weight ratio, the guideline range would not be changed.

**4.** We note that Fox argues also that (1) the government violated *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose impeachment and exculpatory materials; (2) the government's use of Gates, who was a cocaine ad-

dict and pregnant, as a confidential informant constituted such outrageous conduct that it violated Fox's due process rights; (3) the search warrant obtained in this case was based on information obtained pursuant to three invalid *"Glass* warrants" authorizing electronic recording of conversations between confidential informants and Potts and therefore the evidence obtained by searching Potts's home should have been suppressed; (4) the government violated 18 U.S.C. § 201(c)(2) by offering leniency to witnesses in return for their testimony; and (5) he was denied his right to effective assistance of counsel. After having carefully considered each issue, we hold that there is no merit to these arguments and affirm Fox's conviction.