**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Darrell Paul BERTRAND,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Owen RAPAE,**
**Defendant–Appellant.**

Nos. 90–30015, 90–30038.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1991.

Decided Feb. 15, 1991.

Steven Jacobson, Asst. Public Defender, Portland, Ore., for defendant-appellant Rapae.

Hap Wong, Portland, Ore. for defendant-appellant Bertrand.

Leslie K. Baker, Asst. U.S. Atty., Portland, Ore. for plaintiff-appellee.

Before BROWNING, CANBY, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

John Owen Rapae and Darrell Paul Bertrand were convicted of various federal narcotics offenses. They appeal the district court's denial of their motions to suppress evidence, its application of the United States Sentencing Guidelines, and its holding that the Guidelines are constitutional. We affirm.

## FACTS AND PROCEEDINGS BELOW

On May 16, 1989, Bertrand, Rapae and a third defendant were indicted on charges of: (1) conspiring to manufacture, possess with intent to distribute, and distribute controlled substances; (2) manufacturing methamphetamine; (3) possessing with intent to distribute methamphetamine; and (4) manufacturing marijuana. 21 U.S.C. §§ 841(a)(1), 846, 853 (1988), and 18 U.S.C. § 2 (1988). The third defendant pleaded guilty to count four and cooperated with the government. Bertrand pleaded guilty to all four counts, reserving his right to appeal the denial of the pretrial motions. Rapae tried his case to a jury and was convicted of counts 1 through 3 and acquitted of count 4.

This appeal arises from the following facts.

Based on firsthand observations and information provided by three informants, the Clackamas County Sheriff's Office believed defendants were operating a methamphetamine lab at their residence in Oregon City, Oregon. Officer Robert Lowe filed an affidavit with the Honorable Charles A. Sams, a state judge, requesting a warrant to search defendants' persons and residence. Lowe's affidavit detailed the information each informant provided, why the informant could be deemed reliable,[1] and the extent to which the information had been corroborated by the police. Based on the affidavit, Judge Sams issued a search warrant commanding the police to search defendants' persons, residence and "real property."

The Sheriff's Office conducted a search of these areas which resulted in the seizure

---

**1.** Through pretrial discovery, appellants learned that Lowe's affidavit contained several misstatements regarding the reliability of the informants.

of 7 kilograms of methamphetamine, 25 marijuana plants, and other incriminating evidence. The methamphetamine was found in two PVC tubes hidden on the property surrounding defendants' residence. One tube was located in a hollow log and the other was found dangling over a cliff suspended by a wire. The police also obtained a warrant to search a travel trailer defendants had stored at a storage facility. This search uncovered 75 kilograms of ephedrine, a chemical used to make methamphetamine.

Appellants filed pretrial motions to suppress the evidence seized from their residence and property, claiming the affidavit filed in support of the warrant had not provided probable cause. In addition, Rapae filed a motion on his own behalf to suppress evidence seized from him during two arrests that took place several months before the raid on the drug lab. The district court denied the motions. Appellants were convicted and sentenced under the Sentencing Guidelines.

Appellants timely appeal.

## ANALYSIS

### I

### Whether the Affidavit Provided Probable Cause to Search the Property Surrounding Appellants' Residence

■ Appellants claim that, although the affidavit may have provided probable cause to search their residence and persons, it did not support the search of their outlying "real property."

■ We review a court's issuance of a search warrant for clear error and will uphold it so long as the court had a "substantial basis" for concluding probable cause existed based on the totality of the circumstances. *United States v. Stanert,* 762 F.2d 775, 778–79 (9th Cir.), *amended on other grounds,* 769 F.2d 1410 (9th Cir. 1985). In reviewing the validity of a search warrant, we are "limited to the information and circumstances contained

within the four corners of the underlying affidavit." *Id.* at 778; *see also, United States v. Castillo,* 866 F.2d 1071, 1076 (9th Cir.1988).

Appellants fault Lowe's affidavit because it did not specifically request permission to search the land surrounding appellants' residence. However, Judge Sams's *search warrant* did authorize the search of appellants' land, and Lowe's affidavit contained a wealth of information indicating drugs might be found on the land. The fact that Lowe did not specifically *request* to search the land is irrelevant, so long as the affidavit upon which the Judge relied provided probable cause for the search.

We conclude Officer Lowe's affidavit provided probable cause for the search.[2] Lowe stated his information was based on the personal observations of three confidential informants. One of these informants, he said, had been to appellants' drug lab, had seen it operating, had seen large quantities of methamphetamine, and had sampled some of the drugs. This informant disclosed the most intimate details of the operation: how the drugs were processed, what equipment was used, and how the drugs were distributed. He also offered details concerning the personal histories of appellants and the role each played in the operation. Another informant told the police he purchased methamphetamine from appellants and that he had seen a guard armed with an automatic weapon patrolling their property. Finally, a relatively insignificant informant related that he had seen an unusually large number of cars arriving at appellants' residence in recent months.

The affidavit stated that some of the above information was corroborated by independent police investigations. In addition, it stated Lowe was an experienced narcotics investigator and that several of his personal observations indicated appellants were producing methamphetamine.

■ Appellants argue the affidavit listed few facts bearing directly on whether their

---

**2.** Appellants assert several misstatements in the affidavit were critical to Judge Sams's finding of probable cause. We disagree. As we explain in the next section, even if the contested statements are redacted, the affidavit still provides probable cause.

real property might be a source of incriminating evidence. We believe, however, that the extensive descriptions of the drug operation located in appellants' main residence provided Judge Sams with a substantial basis for believing appellants' outlying property contained incriminating evidence as well. It is unimportant that the affidavit said relatively little about the land in *particular* as being a potential source of evidence.[3] As we have stated in the past, "[d]irect evidence that contraband or evidence is at a particular location is not essential to establish probable cause to search the location." *United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). Judges issuing warrants may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *Id.* (citation omitted). Here, Judge Sams reasonably could infer from the size of appellants' drug lab that evidence related to the lab might be found on the nearby land.

In sum, we hold the affidavit provided probable cause for Judge Sams's issuance of the warrant to search appellants' real property, despite the fact that the affidavit itself did not specifically request permission for such a search.

## II

### The Inaccurate Statements in the Affidavit

■ Appellants claim Lowe's affidavit contained materially false information and

that under *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978), the district court should have held a hearing to determine whether the affidavit, when viewed without the incorrect statements, provided probable cause for Judge Sams's issuance of the search warrant. *Franks* holds:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless regard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id.* We agree with the district court that Lowe included inaccurate statements in his affidavit and that he arguably did so with reckless disregard for their truth. The district court correctly found, however, that even without these statements (i.e., assuming the statements are redacted from the affidavit), the affidavit still provided probable cause for the issuance of the warrant.[4]

"Whether false statements or omissions are intentional or reckless is a factual finding reviewed under the clearly erroneous standard." *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988) (citations omitted). "Whether misstatements or omissions are material to a

---

3. We note, however, that Lowe's affidavit *did* discuss appellants' real property. First, Lowe stated that one of the informants had seen a man with an automatic weapon patrolling appellants' fields, which supports the theory that the man was protecting a drug supply located there. Second, Officer Lowe explained:

> I know that persons oftentimes conceal portions of their finished product in separate locations so that in the event they are searched by the police, their entire supply is not confiscated....
> I know that persons who manufacture methamphetamine often store these chemicals in different locations to prevent the uncontrolled mixture of the chemicals which could lead to a dangerous chemical reaction. For this reason, I know that suspects often conceal these chemicals in *different locations on the proper-*

ty including, *but not limited to,* vehicles, outbuildings, and sheds.

(emphasis supplied). Thus, the affidavit was somewhat more particularized than appellants suggest.

4. The district court reasoned:

> I think this is a very close question. There's no question that the affiant [i.e., Lowe] was very careless in his language and inaccurate, in my judgment.
> But the second part of the requirement is that the challenged statements must be essential to the finding of probable cause, and I think it's clear from the transcript and from the evidence that I heard before that what Bein told them [i.e., the police] was sufficient to justify probable cause for the search warrant.

finding of probable cause is subject to de novo review." *Id.* (citation omitted).

Lowe's affidavit relied on information furnished by three informants. The inaccurate statements in the affidavit pertain to the reliability of those informants. The affidavit implied all three informants had provided the police with accurate information in previous criminal investigations. This was incorrect: Lowe and his fellow officers had no reason to believe their sources previously had served as informants. In addition to this error, the affidavit implied the second informant had revealed his identity to the police, when in fact he had remained anonymous. Finally, the affidavit suggested the third informant knew more about "drug culture" and the nature of methamphetamine than he actually did.

Officer Lowe's misstatements are inexcusable, and we by no means countenance them. However, the affidavit contains a plethora of information supporting Judge Sams's probable cause determination even if the statements in question are redacted.

Specifically, the third informant's information, when coupled with police corroboration, sufficed to provide probable cause for the issuance of the warrant. This informant, a man by the name of Ron Bein, identified himself to the police, met with them personally, and stated he had visited appellants' residence. The affidavit affirmed that Bein had described to the police: (1) appellants' persons, residence, property and cars; (2) the role each appellant played in the operation; (3) the process appellants used for drying methamphetamine in their laundry room; (4) what the completed drugs looked, smelled and tasted like and the effect the vapors from the drugs had on him; (5) the equipment used in manufacturing the drugs; (6) the amount of methamphetamine appellants had produced; (7) a trailer belonging to appellants that was filled with beakers, drying racks and chemicals; (8) the street address in Portland to which appellants had moved the trailer; and (9) a conversation he had overheard during which appellants discussed exchanging their drugs for weapons.

After recounting Bein's information the affidavit then stated accurately that the police had verified some of the details. For example, they found appellants' trailer where Bein stated it would be and discovered that it indeed reeked of chemicals. They also confirmed Bein's description of appellants' residence, cars and property.

As appellants point out, the affidavit incorrectly asserted Bein had served as an informant in the past, and it exaggerated Bein's experience with controlled substances. Bein's reliability as an informant undoubtedly is diminished if these statements are redacted from the affidavit. Nevertheless, the extent and detail of Bein's information, and the fact that some of it was corroborated by the police, adequately demonstrated Bein's reliability. Therefore, we hold that under the second prong of the *Franks* test the incorrect statements concerning Bein's reliability and the reliability of the other informants were not essential to Judge Sams's finding of probable cause. Accordingly, no hearing was required.

### III

### *Rapae's Arrest and the Search of His Car*

■ Relying on *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), Rapae contends the district court should have suppressed evidence obtained from the floor of his car and from a bag removed from the car, because he did not consent to the search of either area. His arguments are meritless.

Several months prior to the raid of appellants' drug lab, Rapae was arrested for trying to purchase the services of a police woman disguised as a prostitute. As soon as Rapae made his offer the woman signalled to a nearby lookout officer, who radioed a police cruiser to warn backup officers that Rapae would soon be driving in their direction. The backup officers intercepted Rapae, pulled over his car, and arrested him. They asked for Rapae's

identification, and Rapae responded they would find it in a bag in his car. While Rapae was waiting in the cruiser, a police officer opened his car, retrieved the bag, and found incriminating evidence inside it (i.e., chemical company books, a note pad listing chemicals, a loaded revolver, and $1,000 in cash). The police then searched Rapae's car after obtaining his consent, and found a small quantity of methamphetamine on the floor. The evidence from the bag and the car was introduced at the trial in the present case.

Rapae contends his invitation to the police to get the identification in his bag was not consent to search the bag. It is clear, however, that Rapae indicated the police could open the bag to get his identification, and that their discovery of the incriminating evidence was incident to this opening.

■ Rapae also argues that when he consented to the retrieval and opening of his bag he "was simply acquiescing in a show of police authority." Aside from this bald statement, Rapae makes no effort to show his consent was involuntary. The mere fact that police officers present at the scene requested Rapae's consent does not establish his consent was involuntary.

■ Finally, Rapae argues his consent to the opening of his bag and the search of his car was obtained pursuant to an arrest made without probable cause, citing *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (consent obtained during an illegal arrest is invalid). Rapae claims the arrest was not supported by probable cause because, when the lookout police officer radioed the backup officers, he only told them Rapae had made contact with the undercover officer and was headed in their direction, and he did not give a description of Rapae's car. However, the record reveals that the lookout police officer *did* describe Rapae's car, though he did not radio the precise words Rapae used in making the offer to the undercover police woman. These facts establish probable cause for the arrest.

■ In the first place, an arresting officer need not have personal knowledge of the facts indicating probable cause; rather, an arresting officer may rely on the collective knowledge of the other officers involved in the case. *See United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir.1989), *cert. denied*, — U.S. ——, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990). The information possessed by the undercover police woman and the lookout officer provided the backup team with probable cause to make the arrest, regardless of whether that information was actually communicated to them. In any event, when the lookout officer radioed that Rapae had made the offer to the police woman and would be driving in a certain direction in a particular car, that was sufficient to establish probable cause for Rapae's arrest.

## IV

### The Terry Stop for Drunk Driving

■ Two months after Rapae was arrested on the prostitution charge, but before the raid on the drug lab, an Oregon police officer stopped him on suspicion of drunk driving. Rapae used a false name when questioned and had $1,400 cash in his possession. Both facts were introduced at trial. Relying on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Rapae contends the officer did not possess a reasonable suspicion to stop him, and that this evidence should therefore have been suppressed. His claim is groundless.

Rapae was stopped at 10:30 p.m. He had been driving ten miles an hour under the speed limit, and the officer had seen his car veer across the center line. These facts establish a reasonable suspicion for the stop.

## V

### Application of the Sentencing Guidelines

■ Pursuant to sections 1B1.3(a)(2), 3D1.2(d) and 3D1.3(b) of the Guidelines, defendants convicted of narcotics violations involving different types of drugs typically will receive a base offense level pegged to the aggregate weight of the controlled substances involved. U.S.S.G. §§ 1B1.3(a)(2),

3D1.2(d), 3D1.3(b). The Guidelines contain a "Drug Equivalency" table which equates different drugs by weight ratios for sentencing purposes. *See* U.S.S.G. § 2D1.1, Application Note 10. Once the aggregate weight of the drugs is expressed in terms of a common drug weight, a "Drug Quantity" table sets the base offense level for the crime. *See* U.S.S.G. § 2D1.1(c).

. In the present case, the authorities seized approximately 7 kilograms of methamphetamine and 25 marijuana plants. Under the October 15, 1988 Guidelines,[5] the Drug Equivalency Table equated 25 marijuana plants to 6.25 grams of methamphetamine. Thus, with the addition of the marijuana weight (converted into methamphetamine weight), the aggregate weight of the seizures was just over 7 kilograms of "methamphetamine." Under the Drug Quantity table, that weight of methamphetamine was assigned a base offense level of 32.

The police also seized 75 kilograms of ephedrine and 8 pounds of red phosphorous from appellants' trailer, located in Portland. Ephedrine is not a controlled substance. When combined with hydriodic acid and red phosphorous, however, ephedrine yields methamphetamine. The presentence report stated that 75 kilograms of ephedrine will produce approximately 60 to 70 kilograms of methamphetamine. Based on this estimate of the capability of appellants' operation, the district court found the 7 kilograms of methamphetamine actually seized did not "reflect the scale of the offense," apparently relying on section 2D1.4, Application Note 2.[6] It therefore added the "potential" methamphetamine to arrive at a final estimate of 71 kilograms of methamphetamine as the total aggregate weight of the drugs involved. Under the Drug Quantity table, an aggregate weight of methamphetamine exceeding 25 kilo-

grams was assigned a base offense level of 36.

Appellants claim the court erred in counting the ephedrine, and that therefore their base offense level should have been 32 not 36. We disagree.

Our starting point is section 2D1.4, Application Note 2, which states:

Where there is no drug seizure *or the amount seized does not reflect the scale of the offense,* the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the *size or capability of any laboratory involved.*

U.S.S.G. § 2D1.4, Application Note 2 (emphasis supplied). By its own terms, Application Note 2 would appear to support the district court's base offense level determination in the present case. Appellants maintain, however, that section 2D1.4, the section to which Application Note 2 applies, is itself inapplicable. Of course, if section 2D1.4 does not cover this case, the application notes following it lose whatever relevance they may appear to have facially.

■■■ At the time appellants were sentenced, section 2D1.4(a) provided:

### Attempts and Conspiracies

(a) Base Offense Level: If a defendant is convicted of participating in an *incomplete conspiracy* or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

U.S.S.G. § 2D1.4(a) (emphasis supplied). Under the current Guidelines, section 2D1.-

---

5. Appellants were sentenced prior to the November 1, 1989 amendments to the Guidelines.

6. While the court did not actually cite Application Note 2, its opinion tracked the relevant language of the note: "The Court finds that this was a conspiracy and that the quantity of drugs seized does not reflect the scale of the offense because of the amount of ephedrine found, and

the presence of hydriodic acid and receipts for red phosphorous."

We note that the district court inadvertently misstated the facts here: the parties agree the police recovered 8 pounds of red phosphorous and that the receipts were for hydriodic acid, not the other way around.

4(a) is worded somewhat differently, but the language of Application Note 2 is unchanged. Section 2D1.4(a) now states:

### Attempts and Conspiracies

(a) Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.

U.S.S.G. § 2D1.4(a). The chief difference here is that new section 2D1.4(a) deletes the modifier "incomplete" from "incomplete conspiracy." *See generally, United States v. Alvarez–Cardenas*, 902 F.2d 734, 736 n. 2 (9th Cir.1990) (describing the change as a "clarification").

Appellants urge the earlier version of section 2D1.4(a) is inapplicable to them because their conspiracy was "completed" in the sense that they were convicted of the underlying narcotics offenses. We need not address this contention since section 2D1.1, Application Note 12, provides an independent basis for applying section 2D1.4(a) (and thus Note 2) to this case.

Application Note 12 follows section 2D1.1, which applies to "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses)" of controlled substances. U.S.S.G. § 2D1.1. In addition to being convicted of a narcotics conspiracy, appellants also were convicted of the underlying crimes of manufacturing narcotics and possession with intent to distribute. Therefore, section 2D1.1, Application Note 12, applies to this case.

Application Note 12 was designated "application note 11" at the time appellants were sentenced, but its language remains the same. Application Note 12 provides in relevant part:

Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2) (Relevant Conduct). *If the amount seized does not reflect the scale of the offense, see* Application Note 2 of the Commentary to § 2D1.4. . . .

U.S.S.G. § 2D1.1, Application Note 12 (emphasis supplied). Based on the above passage, we concluded in *United States v. Putney*, 906 F.2d 477, 479 (9th Cir.1990), that Application Note 12 incorporates by reference Application Note 2 of section 2D1.4, making the "scale of the offense" test set forth in Application Note 2 applicable to cases like the present one, where defendants have been convicted of substantive narcotics violations. *Accord, United States v. Evans*, 891 F.2d 686, 687 (8th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2170, 109 L.Ed.2d 499 (1990). In light of this alternative basis for applying Application Note 2, it is immaterial that section 2D1.4(a)'s conspiracy definition arguably may not have encompassed the type of conspiracy of which appellants were convicted. We hold Sentencing Guidelines section 2D1.1, Application Note 12, provided the district court with authority to measure the capability of appellants' drug lab in calculating their base offense level.

 The district court found the 7 kilograms of methamphetamine seized did not "reflect the scale of the offense" because the 75 kilograms of ephedrine indicated appellants' laboratory was capable of producing much greater quantities of methamphetamine. It therefore included the 60–70 kilograms of "potential" methamphetamine in calculating the base offense level. This method of calculating the base offense level accords fully with our decision in *Putney* and the Eighth Circuit's decision in *Evans*. *Putney*, 906 F.2d at 479; *Evans*, 891 F.2d at 687.

Appellants offer several ways of distinguishing *Putney* and *Evans*. Unlike in those cases, they argue, their laboratory was "dismantled" when the authorities raided it. Though they possessed a large quantity of ephedrine and some red phosphorous, they did not possess hydriodic acid. Therefore, they contend, their lab was not truly "capable" of producing 60 to 70 kilograms of methamphetamine.

 The capability of a drug operation is a factual issue reviewed for clear error. *United States v. Upshaw*, 918 F.2d 789, 791 (9th Cir.1990). In the present case, the

district court apparently concluded that, although no hydriodic acid was present, it easily could be obtained. We cannot say its finding concerning the drug lab's capability was clearly erroneous.

Appellants also contend *Putney* and *Evans* apply only where a small quantity of a controlled substance is seized; only in that situation is a district court justified in estimating a drug lab's potential. Neither case limits its holding in this manner. Moreover, appellants' distinction makes no sense as a logical matter: a drug lab's potential remains the same whether controlled substances are seized or not, or are seized in small quantities. In any event, appellants do not explain how courts could be expected to draw lines in this area. At what aggregate weight is a seizure small enough so that it is appropriate for a judge to consider an operation's capability?

We hold the district court correctly took into account the "potential" methamphetamine because the 7 kilograms seized did not reflect the scale of appellants' offense.

### VI

*The Constitutionality of the Guidelines*

Bertrand contends the Guidelines violate due process in several respects.

First, he claims "they violate the requirement that every criminal sentence be imposed individually through the exercise of judicial discretion." We rejected this argument in *United States v. Brady*, 895 F.2d 538, 540 (9th Cir.1990), and subsequent cases. *See for example, United States v. Chalker*, 915 F.2d 1254, 1258–59 (9th Cir. 1990); *United States v. Wilkins*, 911 F.2d 337, 339 (9th Cir.1990). Bertrand's claim fails.

Relying on Judge Letts's opinion in *United States v. Davis*, 715 F.Supp. 1473 (C.D. Cal.1989), Bertrand claims the Guidelines offend due process because they (1) require the sentencing judge to make findings without considering the reliability of the underlying facts, and (2) do not require the underlying facts be proved beyond a reasonable doubt. These claims are foreclosed by our decision in *United States v. Wilson*,

900 F.2d 1350, 1352–54 (9th Cir.1990). *See also, United States v. Rafferty*, 911 F.2d 227, 231 (9th Cir.1990).

The district court's judgment is

AFFIRMED.