8 F.3d 32
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel L. NORMAN, Defendant-Appellant.
 No. 92-30045.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 2, 1993.
Decided Oct. 21, 1993.
 
 Before: WRIGHT, BEEZER and HALL, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Norman challenges his drug and money laundering convictions under 21 U.S.C. §§ 841(a)(1), 856 and 18 U.S.C. § 1956(a)(1)(B)(i), his conviction for being a felon in possession of a firearm under 18 U.S.C. § 922(g), and his sentence to 360 months imprisonment and eight years supervised release. We affirm.
 
 
 3
 * Norman argues that the search warrant affidavit contained intentional or reckless misrepresentations that were the basis for the magistrate's probable cause determination. Thus, he concludes, the district court erred in denying his motion to suppress.
 
 A. Misleading Statements
 
 4
 Evidence seized pursuant to a search warrant must be suppressed if the magistrate's probable cause determination rested upon the intentional or reckless misrepresentations. Franks v. Delaware, 438 U.S. 154, 155-56 (1978). After a hearing, the district court concluded that Norman had not shown that the affidavit contained such misrepresentations. We review for clear error the court's determination that misrepresentations were not intentional or reckless. United States v. Bertrand, 926 F.2d 838, 842 (9th Cir.1991).
 
 1. Informant's Personal Knowledge
 
 5
 Norman argues that the affidavit misrepresented that the informant had personal knowledge of Norman's drug activities, when he/she did not.
 
 
 6
 Information in a search warrant affidavit need not be " 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct.... [I]t is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Franks, 438 U.S. at 165.
 
 
 7
 The informant said that he/she had known Norman for several years. He/she told Lind information about Norman that was not public knowledge. He/she also said that Norman had given him/her a tour of the Eatonville property, which the informant described in detail.
 
 
 8
 The record does not indicate why Deputy Lind did not determine the basis of the informant's knowledge. Lind testified, however, that the informant described the "totality of situations that the informant had witnessed." Lind had also investigated other incidents connecting Norman and the Eatonville site with drug trafficking.
 
 
 9
 Based on the informant's nonpublic information, his/her apparent close relationship with Norman and Lind's other knowledge, the district court could reasonably conclude that Lind believed the informant had personal knowledge.
 
 2. Timeliness of Informant's Information
 
 10
 There is no evidence that Deputy Lind intentionally misrepresented the timeliness of the informant's information. Deputy Lind testified that he understood the informant to be speaking of current events, although no dates were discussed, from the context of their conversations and from the fact that the informant came forward through the tip line. Lind inferred from this that the information pertained to an ongoing, as opposed to historical, crime. He also believed it to be an ongoing manufacturing operation because of his knowledge that Norman had been named as a methamphetamine manufacturer six months earlier, in the Zibell investigation. Norman produced no evidence to indicate that the informant was not reporting on current events, or that Deputy Lind knew or should have known the informant's information was out of date. The district court's conclusion that any misstatement, if there was one, was not reckless or intentional is not clearly erroneous.
 
 
 11
 3. Use of "Lab Site"
 
 
 12
 Norman argues that Lind's use of the term "lab site" in describing the informant's report misled Agent Studhalter and the magistrate into believing the informant had seen a lab on the property. Because we have rejected the main thrust of Norman's objection, that the informant had no personal knowledge of a methamphetamine lab on the property, this allegation is immaterial. The district court did not err.
 
 4. Independent Corroboration
 
 13
 Norman claims that Agent Studhalter failed to disclose that two significant attempts to independently corroborate the informant's statements to Deputy Lind failed. As to the possible power consumption by the motor home, there simply was no misrepresentation. The affidavit reported more than once that the motor home was on the property. There is no evidence to show that it was consuming power, as Norman claims, but the inference was there for the magistrate to draw, just as Norman did.
 
 
 14
 As to the video surveillance, it would have been better for the agent to disclose it. In order for a magistrate to make an independent evaluation of probable cause under the totality of the circumstances, he must know what that totality is. The failure of long term surveillance efforts to produce inculpatory or corroborating evidence could be material in some circumstances. "By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." United States v. Stanert, 762 F.2d 775, 781 (9th Cir.), amended, 769 F.2d 1410 (9th Cir.1985). Nonetheless, omitted facts rise to the level of misrepresentations for Franks purposes "only if the omitted facts 'cast doubt on the existence of probable cause.' " United States v. Johns, 948 F.2d 599, 606-07 (9th Cir.1991) (internal citation omitted), cert. denied, 112 S.Ct. 3046 (1992). Thus, the deliberate omission alone does not invalidate the affidavit and warrant.
 
 
 15
 In this case, the surveillance videotape was not exculpatory, and Agent Studhalter's explanation for its omission was reasonable. Norman offered no evidence to the contrary. There is no evidence that Agent Studhalter intended to mislead. The probative value of the omitted information does not itself give rise to an inference of recklessness. The district court's conclusion that it was not an intentionally or recklessly misleading omission is not clearly erroneous, and the omitted videotape showing nothing more than vehicles coming and going does not detract from probable cause.
 
 B. Probable Cause
 
 16
 Norman contends that the affidavit fails to establish probable cause because 1) it contains no information from which to assess the informant's reliability or basis of knowledge, and 2) the informant's report was stale.
 
 
 17
 A magistrate's determination of probable cause is reviewed for clear error, and will not be reversed if the court had a substantial basis for concluding that probable cause existed based upon the totality of the circumstances. Bertrand, 926 F.2d at 841; United States v. Hernandez-Escarsega, 886 F.2d 1560, 1563 (9th Cir.1989), cert. denied, 497 U.S. 1003 (1990).
 
 1. Sufficiency of Allegations
 
 18
 Norman argues that the totality of the circumstances test articulated in Illinois v. Gates, 462 U.S. 213 (1983), did not eliminate the previously-established requirement that there be some facts bearing on both the informant's reliability and his basis of knowledge in order to support a determination of probable cause. See 462 U.S. at 230. A weakness in either the reliability or basis of knowledge aspects are not fatal to a finding of probable cause; all that is needed is a substantial basis for the finding. United States v. Angulo-Lopez, 791 F.2d 1394, 1396 (9th Cir.1986). Evidence bearing on the informant's reliability and his basis of knowledge is considered together with other relevant evidence in making the probable cause determination. Id. Independent police corroboration of details may bolster a deficient showing in reliability or basis of knowledge. Id. at 1397. In making the probable cause determination, " 'the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' " Id. (quoting Gates, 462 U.S. at 243-44 n. 13).
 
 
 19
 The affidavit reveals nothing about the veracity or reliability of the informant. Because the investigation independently corroborated numerous details of the informant's report, however, this deficiency is not critical. The affidavit does not disclose the basis of the informant's knowledge regarding Norman's criminal activities. It does, however, contain information supporting an inference that the informant had a basis for his/her knowledge. See Angulo-Lopez, 791 F.2d at 1398 n. 1. A magistrate would be justified in inferring that the informant's reports were based on personal knowledge.
 
 
 20
 Furthermore, Norman's argument focuses solely on the informant's report. That is not the only basis for a finding of probable cause. The affidavit contained information from several independent investigations linking Norman with drug trafficking, and a plethora of suspicious noncriminal acts strongly supporting an inference of drug trafficking and money laundering. This information, without the informant's report, would warrant a reasonable person in thinking that Norman was involved in drug activity, particularly methamphetamine manufacturing.
 
 
 21
 Under the totality of the circumstances, the magistrate's determination that the affidavit supported a determination of probable cause and the issuance of search warrants was not clearly erroneous.
 
 2. Staleness of Information
 
 22
 Norman asserts that, because there is no evidence as to when the informant was on the property, the only certain date for the information is April 1988. He argues that the information was too stale to establish probable cause to believe that a methamphetamine lab, which can be disassembled and moved in hours, would still be there 19 months later, in October 1989.
 
 
 23
 "A search warrant is not stale where 'there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.' With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity." Angulo-Lopez, 791 F.2d at 1399 (internal citations omitted); cf. United States v. Dozier, 844 F.2d 701, 707 (9th Cir.) (affidavit in November relied on investigation from prior June; information not stale because marijuana cultivation is long-term operation), cert. denied, 488 U.S. 927 (1988). "The mere lapse of substantial amounts of time is not controlling in a question of staleness." 844 F.2d at 707.
 
 
 24
 The evidence revealed that Norman had been involved in drug crimes five years earlier, and in drug-related events in April 1988, August and September 1988, and April 1989. Surveillance after the informant's report continued to indicate the suspected methamphetamine lab was operating, and continued to reveal new barrels of suspected R-11 freon. The latest observation of Norman transporting freon occurred October 4, 1989. The authorities had no information to indicate that Norman had ceased to operate the suspected lab. Moreover, Deputy Lind indicated that even if the lab equipment itself could be rapidly disassembled and removed, some of the traces of manufacturing activities can never be removed, and would have been evidence justifying a search.
 
 
 25
 The affidavit "tended to establish the existence of a widespread, firmly entrenched, and ongoing narcotics operation in which [the defendant] played a pivotal role. In such circumstances, staleness arguments lose much of their force." Hernandez-Escarsega, 886 F.2d at 1566; see United States v. Landis, 726 F.2d 540, 542 (9th Cir.) ("[t]he continuous nature of the activity diminishes the significance of the time lag between the acts described in the affidavit and presentation of the affidavit to the magistrate"), cert. denied, 467 U.S. 1230 (1984).
 
 
 26
 The magistrate did not clearly err in finding probable cause to believe criminal evidence could reasonably be sought on Norman's property in October 1989.
 
 II
 
 27
 Norman contends that he was seized and detained in violation of the Fourth Amendment during the search of his residence. He argues that the district court should have suppressed his subsequent statements made to law enforcement agents, as they were the product of an unlawful seizure of his person. Whether a defendant was unlawfully detained is reviewed de novo, while a district court's finding of the underlying facts is reviewed for clear error. United States v. Johnson, 903 F.2d 1219 (9th Cir.1990), cert. denied, 498 U.S. 985 (1990).
 
 
 28
 "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981) (footnote omitted). The magistrate determined that the officers had probable cause to believe that Norman was committing a crime. Norman's detention prevented him from fleeing, minimized the risk of harm to the officers executing the warrants, and ensured that Norman would not be able to destroy evidence at the home or the Eatonville property.
 
 
 29
 Norman's attempts to distinguish Summers are not persuasive. Norman's contention that Summers only authorizes a brief and narrowly circumscribed Terry stop, see Terry v. Ohio, 392 U.S. 1, 30 (1968), is mistaken. The seizure authorized in Summers was a "detention" that lasted for the duration of the search. See Summers, 452 U.S. at 696.
 
 
 30
 The fact that the defendant in Summers was leaving the premises before the search commenced, while Norman was returning home after the search had already begun, is a distinction without a difference. Whether a defendant is detained upon leaving or returning to the premises bears no relationship to the intrusiveness of the seizure or the importance of the government's law enforcement interests; when a defendant returns home during the search, there is still a danger that he will attempt to flee, harm officers, destroy evidence, or endanger occupants of the premises. In addition, there is a search warrant in both situations, adding to the objective reasonableness of detaining the subject of the search. If these considerations justify the detention in Summers, they justify the detention of Norman as well.
 
 
 31
 Since Norman's detention was lawful, the district court properly refused to suppress his subsequent statements.
 
 III
 
 32
 Norman argues that admission of the testimony of Fitzgerald, Zibell, and Eury concerning Norman's prior drug activities violated due process. We review a court's admission of prior bad act evidence under Rule 404(b) for abuse of discretion. United States v. Conners, 825 F.2d 1384, 1390 (9th Cir.1987).
 
 
 33
 Before evidence of prior misdeeds can be introduced under Rule 404(b), five conditions must be satisfied: (1) there must be sufficient proof for the jury to find the defendant committed the earlier act; (2) the other act must not have been too remote in time; (3) if used to prove intent, the prior act must be similar; (4) it must be used to prove a material issue; and (5) the probative value must outweigh prejudice. United States v. Ross, 886 F.2d 264, 267 (9th Cir.1989), cert. denied, 494 U.S. 1083 (1990). Norman argues that the bad acts testimony was inadmissible because the acts described by Fitzgerald were too remote in time, and the acts described by Zibell and Eury were not sufficiently supported by the evidence.
 
 
 34
 The amount of time that must pass before an act is considered remote varies with each case and depends on the theory of admissibility and the similarity between the prior acts and the current offense. United States v. Spillone, 879 F.2d 514, 519 (9th Cir.1989), cert. denied, 498 U.S. 864 (1990) and cert. denied, 498 U.S. 878 (1990). Prior bad acts over ten years old are not too remote to prove intent where those acts were very similar to the offense conduct. See Spillone, 879 F.2d at 519; Ross, 886 F.2d at 267. Fitzgerald's testimony is comparable to the prior act testimony in Ross and Spillone and is thus governed by the same time limits. As in Ross and Spillone, the prior act testimony was introduced to show intent. Furthermore, the prior acts described by Fitzgerald are similar to Norman's present offenses under 21 U.S.C. § 841, as all of them involve the intent to distribute a large quantity of narcotics. The negotiations between Fitzgerald and Norman occurred roughly nine years before the present offense conduct and eleven years before the trial, thus falling squarely within the time allowed by Ross and Spillone. The district court did not abuse its discretion in ruling that the acts described by Fitzgerald were not too remote to be admissible.
 
 
 35
 It appears that at trial, Norman did not object to the testimony of Eury and Zibell. Consequently, we review his claims of error on appeal for plain error. See United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.1990), cert. denied, 111 S.Ct. 363 (1990); United States v. Morris, 827 F.2d 1348, 1350 (9th Cir.1987), cert. denied, 484 U.S. 1017 (1988). Zibell and Eury were direct witnesses to the events and conversations they described, and their testimony was uncontroverted at trial. A jury court have found that this testimony supported a finding that Norman did the alleged acts by a preponderance of the evidence. Admission of their testimony does not constitute plain error.
 
 IV
 
 36
 Norman argues that the identification procedure administered to Eury the night before her testimony was impermissibly suggestive. Norman contends that the procedure tainted Eury's out-of-court and in-court identification, and consequently, introduction of that testimony violated due process. The government does not deny that the identification was suggestive, arguing instead that the identification was nonetheless reliable.
 
 
 37
 A defendant's due process rights are not violated by the admission of testimony resulting from a suggestive identification procedure if the identification possessed sufficient indicia of reliability. Manson v. Brathwaite, 432 U.S. 98, 106 (1977). Whether an identification is reliable depends upon the witness's opportunity to view the defendant and the witness's degree of attention. In evaluating reliability, we consider also the accuracy of the witness's prior description, the witness's level of certainty, and the length of time between the prior observation and the identification. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972).
 
 
 38
 Eury met three times with Norman, always one-on-one and for considerable periods of time, and thus had opportunities to observe his appearance and manner. Eury accurately described Norman as having curly hair and a beard in 1988, whereas at trial he was clean shaven and had straight hair. Less than two years passed between those meetings and her court appearance. Given the fact that Norman's appearance at trial was significantly different from when Eury last saw him, and that in looking through the window on the courtroom door she could only see Norman from the side, her failure to identify Norman on the day before her testimony does not outweigh these considerations. On balance, the evidence indicates that Eury's identification of Norman was reliable.
 
 
 39
 Moreover, any error in permitting Eury to identify Norman at trial is harmless. Even without Eury's testimony, there is ample evidence demonstrating Norman's intent to distribute methamphetamine. The existence of a methamphetamine manufacturing and distribution equipment, by itself, is a strong indication that Norman was making more methamphetamine than he needed for personal use.
 
 V
 
 40
 Norman contends that he should have been acquitted on the 22 counts of money laundering because the evidence was insufficient to prove his guilt. Evidence is sufficient to support a conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 
 
 41
 Norman emphasizes that he did not violate the money laundering statute because he made no attempt to conceal his identity as the purchaser of the vehicles and the holder of the bank account. Relying on United States v. Sanders, 929 F.2d 1466, 1472 (10th Cir.1991), cert. denied, 112 S.Ct. 143 (1991), Norman apparently argues that concealment of identity is a necessary element of a money laundering offense.
 
 
 42
 Norman's interpretation of the money laundering statute is incorrect. Nothing in the text of that statute states that concealment of identity is necessary to prove that a defendant is disguising the nature or source of illegally obtained funds. The Tenth Circuit has explicitly rejected Norman's reading of the statute and denied that Sanders stands for such a proposition. See United States v. Lovett, 964 F.2d 1029, 1034 (10th Cir.), cert. denied, 113 S.Ct. 169 (1992).
 
 
 43
 Norman was convicted of money laundering, not because he tried to obscure his identity or his ownership of the funds, but because he tried to hide the fact that the money was derived from illegal drug transactions. Such concealment of the nature and source of the proceeds constitutes a violation of the statute, regardless of whether Norman also attempted to disguise his identity. By representing that the funds he used during these transactions were earned through legitimate business activities, Norman made statements "designed to hide the provenance of the funds involved." United States v. Jackson, 935 F.2d 832, 841-42 (7th Cir.1991).
 
 
 44
 There was plenty of evidence that Norman disguised the nature and source of the funds he used in buying the two vehicles. The credit applications for both the motor home and the automobile misrepresented Mary Norman's employment, and the motor home dealer's cash transaction report indicates Dan Norman lied about his employment also. Norman also misrepresented his occupation when he opened the business checking account for Blue Mountain Construction, claiming to be a subcontractor. Agent Studhalter's testimony, which the jury apparently credited, refuted any claim that these employment representations were legitimate. Viewing the evidence in the light most favorable to the prosecution, a rational jury could conclude that Norman purchased the vehicles and opened the bank account with proceeds from his narcotics activities, knowing that the transactions were designed at least in part to conceal the nature and source of those proceeds.
 
 VI
 
 45
 Norman challenges the sufficiency of the evidence used by the district court in calculating the quantity of methamphetamine he produced. We review the factual findings underlying a sentence for clear error. United States v. Chapnick, 963 F.2d 224, 226 (9th Cir.1992).
 
 
 46
 Where the amount of narcotics seized does not represent the true scale of the offense, the sentencing judge is instructed to approximate the true quantity. United States Sentencing Commission, Guidelines Manual § 2D1.4 n. 2 (Nov. 1991). The judge may consider "financial or other records" and "the size or capability of any laboratory involved." Id. Estimates of the quantity of drugs involved must be supported by a preponderance of the evidence. United States v. Harrison-Philpot, 978 F.2d 1520, 1523 (9th Cir.1992), cert. denied, 113 S.Ct. 2392 (1993).
 
 
 47
 Norman contends that the evidence is insufficient to prove that the drums ever contained freon, since no freon was ever found. On the contrary, the evidence is quite substantial. The evidence shows, and the jury concluded, that Norman was engaged in the manufacture of methamphetamine, which requires use of freon as a solvent. The drums found on his property are of the type and color as those in which Racon 11 freon is purchased, and the only one which was not repainted was still labeled as freon. There was also evidence that Norman purchased freon on at least one occasion, and in his interview he admitted to such.
 
 
 48
 On the other hand, there is very little evidence to suggest that the barrels did not contain freon. That the drums no longer contained freon at the time of the search proves little, as that circumstance is consistent with a methamphetamine operation that has finished production. The only other evidence is Norman's statement during his interview that he purchased freon for Duane Hess, who did all of the manufacturing and returned the empty drums to him. That claim, however, was not supported by any other evidence and was rejected by the jury verdict finding Norman guilty.
 
 
 49
 The evidence of Norman's unexplained income reinforces the court's approximation of the drug quantity involved. The testimony of the IRS agents, who concluded from records found in Norman's residence that the Normans had spent at least $450,000 in 1988 and 1989, was uncontroverted. There is no evidence that Norman had a legitimate source of income during that period. Although Norman claims he sold the Eatonville property for a substantial profit, he produced no evidence to support his contention.
 
 
 50
 The convictions and sentence are AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3