**UNITED STATES of America,
Plaintiff—Appellee,**

v.

**Alfredo GONZALEZ–RODRIGUEZ,
Defendant—Appellant.**

No. 02–30027.

United States Court of Appeals,
Ninth Circuit.

Submitted Aug. 2, 2002.*

Decided April 9, 2003.

---

* This disposition is not appropriate for publication and may not be cited to or by the courts

of this circuit except as provided by Ninth Circuit Rule 36–3.

* This panel unanimously finds this case suit-

able for decision without oral argument. *See* Fed. R.App. P. 34(a)(2). Accordingly, Gonzalez–Rodriguez's motion for oral argument is denied.

Before: CHOY, FERGUSON, and BOOCHEVER, Circuit Judges.

### MEMORANDUM **

Alfredo Gonzalez–Rodriguez pled guilty to possession of a firearm as an illegal alien, in violation of 18 U.S.C. § 922(g)(5)(A). A jury also convicted him of one count of manufacturing and aiding and abetting the manufacture of over 500 grams of a mixture containing methamphetamine, in violation of 21 U.S.C. § 841(a) & (b)(1)(A) and 18 U.S.C. § 2, and one count of conspiring to manufacture over 500 grams of a mixture containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A) and 846.

In this appeal, Gonzalez–Rodriguez challenges his sentence on three grounds. First, he argues that the district court applied the wrong version of the Sentencing Guidelines resulting in a higher sentence, in violation of the Ex Post Facto clause. Second, he disputes the district court's approximation of his drug quantity. Third, Gonzalez–Rodriguez claims that the district court erred in determining the relevant conduct for which he should be held accountable. Because the parties are familiar with the factual and procedural history of this case, we do not recount it here except as necessary to explain our decision. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

### I. Applicable Version of Sentencing Guidelines

■ Gonzalez–Rodriguez claims that the district court erred by applying the 2001 version of the Guidelines Manual, which was in effect on the date of sentencing, rather than the 1998 version of the Guidelines,[1] which was in effect when he committed the instant offenses. He notes that, in the 2001 version of § 2D1.1, Application Note 10 specifically sets forth a conversion ratio for determining pseudoephedrine's marijuana equivalent for the purpose of computing a base offense level. In contrast, the 1998 version of § 2D1.1 does not include pseudoephedrine in the Drug Quantity Table, nor does it provide instructions for converting pseudoephedrine into a marijuana equivalent. Gonzalez–Rodriguez argues that the district court's application of the 2001 Guidelines resulted in a higher sentence, in violation of the Ex Post Facto Clause.

Generally, a district court must apply the version of the Sentencing Guidelines in effect on the date of sentencing. *United States v. Chea*, 231 F.3d 531, 539 (9th Cir.2000) (quoting *United States v. Johns*, 5 F.3d 1267, 1269 (9th Cir.1993)). "However, it is well-established in this circuit that whenever application of an amended version of a guideline would result in a harsher sentence than the earlier version, application of the new guideline would violate the Ex Post Facto Clause." *Johnson v. Gomez*, 92 F.3d 964, 968 (9th Cir.1996) (citations omitted). In order to demonstrate an Ex Post Facto Clause violation, the defendant must demonstrate "more than a speculative risk" of an increase in punishment; that is, he must "demonstrate an increase in punishment with certain-

---

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

1. Gonzalez–Rodriguez actually argues that the district court should have applied the 1999 version of the Guidelines since he was convicted for actions committed before Octo-ber 26, 2000. However, there was no 1999 version of the Guidelines. Rather, the 1998 version, together with a Supplement issued on May 1, 2000, was the operative manual during 1999. We assume that Gonzalez–Rodriguez meant to refer to the 1998 version, which would have been applicable when he committed the instant offenses.

ty.... Under such circumstances, ... the defendant [must] be sentenced pursuant to the guidelines in effect at the time of the offense." *Id.* at 967–68 (citations omitted); *see also Chea,* 231 F.3d at 539.

Gonzalez–Rodriguez's claim fails because the district court's application of the 2001 Guidelines did not result in a harsher sentence than he would have received under the 1998 Guidelines. Although the 1998 Guidelines did not provide a formula for converting pseudoephedrine into marijuana, they did instruct the district court to approximate drug quantity where "there is no drug seizure or the amount seized does not reflect the scale of the offense...." § 2D1.1, cmt. n. 12; *see United States v. Roberts,* 5 F.3d 365, 372 (9th Cir.1993). Since law enforcement officers did not seize any significant quantities of methamphetamine in the instant case, the district court properly approximated Gonzalez–Rodriguez's drug quantity. Specifically, the district court relied on Traci Rose, the Government's chief witness, who established that there were 6.36 kilograms of pseudoephedrine at a Gervais, Oregon location. Rose made a conservative estimate of the amount of methamphetamine Gonzalez–Rodriguez could have produced from the pseudoephedrine "us[ing] the lowest number, ... 50 percent [yield] ... [which] would result in 3.18 kilograms of methamphetamine." [Transcript ("Tr.") 374] Under the 1998 Guidelines, 3.18 kilograms of methamphetamine (actual) results in a base offense level of thirty-eight. *See* § 2D1.1(c)(1) (1998).

Likewise, under the 2001 Guidelines' Drug Equivalency Table, Gonzalez–Rodriguez would have a base offense level of thirty-eight because 6.36 kilograms of pseudoephedrine is the equivalent of 63,-300 kilograms of marijuana. *See* § 2D1.1(c)(1) & cmt. n. 10 (2001). Because Gonzalez–Rodriguez's base offense level is the same under both the 1998 and 2001 versions of the Guidelines, the district court's application of the latter did not result in a harsher punishment and there was no Ex Post Facto Clause violation.[2]

**II. Drug Quantity**

■ Gonzalez–Rodriguez contends that the district court based its determination of his drug quantity on unreliable evidence. The district court's determination whether a particular item of evidence is sufficiently reliable to be considered at sentencing is reviewed for an abuse of discretion. *United States v. Blitz,* 151 F.3d 1002, 1009 (9th Cir.1998). In the instant case, the district court initially stated that the Government's chief expert, Rose, based her opinion on "a lot of ifs[.]" [Tr. 414] However, it ultimately concluded that Rose was reliable. The record supports the district court's conclusion. Rose detailed her training and certification, as well as the procedures she took when she obtained and tested samples from the methamphetamine lab. She also explained that her case analysis underwent a routine peer review process before being released to the court. We cannot say that the district court abused its discretion in relying on Rose's testimony.

■ Gonzalez–Rodriguez also challenges the district court's determination of the clandestine methamphetamine lab's capacity. He notes that, although law enforcement officers found pseudoephedrine,

**2.** Gonzalez–Rodriguez also appears to claim that, if the district court had applied the 1998 Guidelines, there would have been a Fifth Amendment violation because "the 199[8] version [of the Guidelines] did not provide for punishment based on a quantity of pseu-

doephedrine unless the defendant was charged under 21 U.S.C. § 841(d)." [Appellant's Opening Brief ("AOB") 10] His claim is foreclosed by this court's decision in *United States v. Roberts,* 5 F.3d 365, 372 (9th Cir. 1993).

a precursor chemical, they did not actually seize any substantial quantities of methamphetamine. Gonzalez–Rodriguez disputes the district court's conclusion that the lab could have produced 3.18 kilograms of methamphetamine using the seized precursor chemicals.

The " 'capability of a drug operation is a factual issue reviewed for clear error.' " *United States v. Rosacker*, 314 F.3d 422, 427 (9th Cir.2002) (quoting *United States v. Bertrand*, 926 F.2d 838, 846 (9th Cir. 1991)). "Review under the clearly erroneous standard is significantly deferential, requiring for reversal a definite and firm conviction that a mistake has been made. The standard does not entitle a reviewing court to reverse the finding of the trial court simply because the reviewing court might have decided differently." *United States v. Asagba*, 77 F.3d 324, 326 (9th Cir.1996) (citations omitted); *see also United States v. Palafox–Mazon*, 198 F.3d 1182, 1186 (9th Cir.2000).

Where, as here, "there is no drug seizure or the amount seized does not reflect the scale of the offense," the sentencing court "shall approximate the quantity of the controlled substance." U.S.S.G. §§ 2D1.1, cmt. n. 12; *United States v. Basinger*, 60 F.3d 1400, 1409 (9th Cir. 1995). "This court specifically has allowed a sentencing court to calculate 'potential' methamphetamine based on seized precursor chemicals.... [It has] also approved a sentencing court's reliance on expert testimony that estimates production capability, even when the expert must assume the availability of precursor chemicals that were not seized or were found in short supply." *Basinger*, 60 F.3d at 1409 (citations omitted); *see also Bertrand*, 926 F.2d at 846; *Roberts*, 5 F.3d at 372.

In the instant case, the district court's drug quantity estimate was not clearly erroneous. The Government's evidence established that there were substantial quantities of all of the precursor chemicals necessary to manufacture methamphetamine through the "red phosphorous" method. In addition, there were traces of methamphetamine, as well as phenyl–2–propanone, a by-product formed along with the methamphetamine, at the clandestine lab. Taking into account the quantity of available precursor chemicals, Rose estimated that the "potential" methamphetamine that could have been produced using the seized precursor chemicals was 3.18 kilograms. [Tr. 374]

Gonzalez–Rodriguez argues that the district court should not have relied on Rose, or any of the other Government witnesses, because they "said that the lab could have produced some methamphetamine or no methamphetamine. The evidence showed that success in manufacturing methamphetamine was contingent on using the correct chemicals, doing it correctly and 'cooking it long enough.' " [AOB 12 (citing Tr. 377), 23–25] However, the witnesses were merely stating the obvious fact that a cook's yield will depend on his having the necessary precursor chemicals and cooking the chemicals properly.

Furthermore, there was evidence demonstrating that Gonzalez–Rodriguez and his co-conspirators had the necessary chemicals and were able to cook them correctly. Law enforcement officers located ample quantities of the "correct" chemicals at the clandestine lab and found active chemical reductions being performed. Moreover, various individuals affiliated with the conspiracy testified that Gonzalez–Rodriguez was involved with purchasing and cooking the chemicals at the lab, and that he even oversaw the work of other members of the conspiracy. Indeed, Gonzalez–Rodriguez admitted that he helped produce methamphetamine. [Tr. 452]

Thus, contrary to Gonzalez–Rodriguez's claim, the Government's evidence was not

vague about the production capability of the lab. The estimate set forth by the Government, and accepted by the district court, was a reasonable one based on evidence of a very well-stocked, well-equipped methamphetamine lab and Gonzalez–Rodriguez's knowledge of methamphetamine production. We, therefore, affirm the district court's determination of drug quantity.

## III. Relevant Conduct

Pursuant to U.S.S.G. § 1B1.3, the "district court may only sentence a defendant for relevant conduct within the scope of the defendant's agreement that was reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake jointly." *United States v. Gutierrez–Hernandez,* 94 F.3d 582, 585 (9th Cir.1996) (citations omitted). "In other words, under the Sentencing Guidelines, each conspirator is to be judged on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators, rather than on the distribution made by the entire conspiracy." *Id.* (citation omitted); *see also United States v. Whitecotton,* 142 F.3d 1194, 1198 (9th Cir.1998); § 1B1.3, cmt. n. 2.[3] The district court's finding of relevant conduct is reviewed for clear error. *United States v. Fox,* 189 F.3d 1115, 1118 (9th Cir.1999).

■ Gonzalez–Rodriguez argues that he could not reasonably foresee that the conspiracy would produce the estimated quantity of potential methamphetamine. [AOB 30] The record belies his claim. Gonzalez–Rodriguez lived on the site of the methamphetamine lab. He obtained and prepared

chemical supplies, helped cook the chemicals, oversaw his co-conspirators work in the lab, and packaged methamphetamine. In light of these facts, the district court did not clearly err by determining that Gonzalez–Rodriguez was responsible for the total amount of methamphetamine that could have been produced using the precursor chemicals at the Gervais lab.

■ Gonzalez–Rodriguez also contends that the district court did not make sufficient factual findings to support a conclusion that he could have foreseen the quantity of drugs upon which the district court based his sentence. A "district court must make an express factual finding regarding the amount of drugs that the defendant reasonably foresaw as being part of the conspiracy[.]" *Whitecotton,* 142 F.3d at 1198 (citations omitted). However, it may "satisfy the requirement that it make factual findings by specifically adopting the findings of the presentence report[.]" *Id.; see also United States v. Naranjo,* 52 F.3d 245, 249 (9th Cir.1995). Here, the district court expressly adopted the findings of the PSR, which set forth evidence of Gonzalez–Rodriguez's participation in the conspiracy's manufacture of methamphetamine and concluded that, "[f]or purposes of relevant conduct, defendant is accountable for the precursor chemicals found during the search of" the Gervais location. [PSR ¶¶ 29, 36] The district court's adoption of the PSR was sufficient to support its finding of Gonzalez–Rodriguez's relevant conduct.

AFFIRMED.

---

**3.** § 1B1.3, cmt. n. 2 states, "With respect to offenses involving ... controlled substances[,] the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertak-

en criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."